## HIPOLITE EGG COMPANY *v.* UNITED STATES.

ERROR TO AND APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF ILLINOIS.

No. 519.   Submitted January 5, 1911.—Decided March 13, 1911.

The object of the Pure Food and Drug Act of June 30, 1906, c. 3915, 34 Stat. 768, is to keep adulterated articles out of the channels of interstate commerce, or if they enter such commerce to condemn them while in transit, or in original or unbroken packages after reaching destination; and the provisions of § 10 of the act apply not only to articles for sale but also to articles to be used as raw material in the manufacture of some other product.

In construing the Pure Food and Drug Act, all articles, compound or single, not intended for consumption by the producer, are regarded as designed for sale, and for that reason it is the concern of the law to have them pure.

The remedies given by the statute *in personam* and by condemnation are not inconsistent and they are not dependent. *The Three Friends,* 166 U. S. 1.

By the Pure Food and Drug Act adulterated articles are, while in interstate commerce, made culpable as well as their shipper; while in original unbroken packages they can be seized and they carry their own identification as contraband of law; they are subject to the power of Congress to regulate interstate commerce, and they are not beyond the jurisdiction of the National Government because within the borders of a State. *Quære,* how far such articles can be pursued beyond the original package.

Congress can use appropriate means to execute the power conferred upon it by the Constitution and the seizure and condemnation of prohibited articles in interstate commerce at their point of destination in original unbroken packages is an appropriate means. *McCulloch* v. *Maryland*, 4 Wheat. 316; *Lottery Case*, 188 U. S. 321, 355.

In a proceeding *in rem* under § 10 of the Pure Food and Drug Act the court has jurisdiction to enter personal judgment for costs against the claimant. *Quære*, whether the certificate in this case presents the question of jurisdiction to award costs.

THE facts, which involve the construction of certain provisions of the pure food act of June 30, 1906, are stated in the opinion.

*Mr. Thomas E. Lannen* and *Mr. Edward T. Fenwick* for plaintiff in error:

Section 10 of the Food and Drugs Act does not apply to an article of food which has not been shipped for sale, but which has been shipped solely for use as raw material in the manufacture of some other food product. *United States* v. *Sixty-five Casks Liquid Extracts*, 170 Fed. Rep. 449; *United States* v. *Knowlton Danderine Co.*, 175 Fed. Rep. 1022. See also opinion of Judge Sater in the District Court for the Southern District of Ohio, Western Division, in *United States* v. *Forty-six Packages and Bags of Sugar*, No. 1964, on exceptions and demurrer, rendered about September 3, 1910.

When goods shipped into a State have been so acted upon by the party in the State receiving them that they become mixed with the general property in the State and the goods become incorporated with the mass of state property they are no longer in interstate commerce. *Waring* v. *The Mayor*, 8 Wall. 110; *Low* v. *Austin*, 13 Wall. 29; *Cook* v. *Pennsylvania*, 97 U. S. 566.

The court does not obtain jurisdiction to proceed against the *res* when the statute makes the *res* liable to be proceeded against only under a certain state of facts and such facts do not exist with respect to the *res* pro-

ceeded against. And in such a case the court has no jurisdiction to confiscate the *res*.

A United States District Court has no jurisdiction to proceed *in rem* under § 10 of the Food and Drugs Act of June 30, 1906, against goods that have passed out of interstate commerce before the proceeding *in rem* was commenced.

In a proceeding *in rem* the court has no jurisdiction to assess the costs *in personam* against a claimant who simply files an answer but who does not enter into a stipulation to pay the costs of the proceeding. *The Monte A*, 12 Fed. Rep. 331.

Where the law provides only for a proceeding *in rem*, a proceeding *in rem* and one *in personam* cannot be joined in the same libel. *The Alida*, 12 Fed. Rep. 343.

*Mr. Assistant Attorney General Fowler* for the United States:

The article of food in question was, when seized, in the original packages as shipped, and had not passed beyond the jurisdiction of the court by having become mixed and intermingled with other property of the consignee.

The cans of eggs in question had not lost their identity as articles of interstate commerce. *Brown* v. *Maryland*, 12 Wheat. 419; *Leisy* v. *Hardin*, 135 U. S. 100; *Schollenberger* v. *Pennsylvania*, 171 U. S. 1; *Waring* v. *The Mayor*, 8 Wall. 110; *Low* v. *Austin*, 13 Wall. 29; *Cook* v. *Pennsylvania*, 97 U. S. 566, are not antagonistic to the principles recently decided in cases cited by appellant.

As to what constitutes an original package, see definition given in *McGregor* v. *Cone*, 104 Iowa, 465, 471. The cans in question had not passed beyond the jurisdiction of the United States authorities.

The fact that the articles in question were the property of consignor when shipped to themselves, to be used in the manufacture of pastry, does not deprive them of the

privileges or relieve them from the liabilities of an inter-
state shipment.

The articles in question having been shipped from one
State into another in violation of an act of Congress and
having thus become liable to seizure, they might be pur-
sued and seized wherever and in whatever condition
Congress has prescribed, regardless of whether they had
or had not become subject to the state laws. See §§ 3062,
3456, Rev. Stat. The same principle applies to the stat-
ute under consideration.

Congress has provided that the products may be seized
as long as they remain unloaded, unsold, or in the original
unbroken packages. The fact that the packages had been
commingled with other goods can only be material in de-
termining whether the goods had become subject to the
state laws, but that fact is wholly immaterial, as their
subjection to state laws set no limitation upon the power
of Congress to authorize that they be further pursued.

Section 10 of the act when properly construed, author-
izes the seizure of the cans of eggs in question at the in-
stance of the United States Government.

The Food and Drugs Act is a remedial statute, and as
§ 10 prescribes one of the methods of suppressing the
frauds aimed at by the act, it should be liberally construed.
*Taylor* v. *United States*, 3 How. 197, 210; *Rankin* v. *Hoyt*,
4 How. 327, 332; *United States* v. *Stowell*, 133 U. S. 1, 12;
*Anglo-California Bank* v. *Secretary of the Treasury*, 76
Fed. Rep. 742, 748; *In re Coy*, 31 Fed. Rep. 794; *S. C.*,
127 U. S. 733, 739; *Farmers' Bank* v. *Dearing*, 91 U. S.
29, 35; *New Haven R. R. Co.* v. *Interstate Commerce Com.*,
200 U. S. 361, 391; Endlich, Inter. Stats., § 333; *Gray* v.
*Bennett*, 3 Metcalf, 522, 529; *Reed* v. *Northfield*, 13 Pick.
94, 101; *Ellis* v. *Whitlock*, 10 Missouri, 781; *Sickles* v.
*Sharp*, 13 Johnson, 497.

The statute is a remedial one designed to prevent
frauds upon the general public, and the intention of Con-

gress in creating the same is undoubted. *United States* v. *Freeman*, 3· How. 556, 565; Endlich, Inter. Stats., § 110. When all parts of the act are read together it clearly appears that Congress intended that the shipment of an article of food under the circumstances and for the purpose under and for which the preserved whole egg in question was shipped, should render such product liable to seizure.

A reasonable and natural interpretation of the exact language used in § 10 of the act includes the articles of food seized in this case.

The construction insisted upon by plaintiff in error would in a large measure nullify the beneficent effect of the act, and defeat the object which Congress had in mind in passing the same and should not be adopted, unless the language of the act can admit of no other interpretation.

The court did not err in adjudging the costs of the cause against plaintiff in error. While at common law costs were not recoverable *eo nomine*, and hence cannot be recovered except by statutory authority, 11 Cyc. 24, under § 823, Rev. Stat., certain costs may be taxed and allowed to the officials mentioned. *Jordan* v. *Agawam Woolen Co.*, 3 Cliff. 239. See also chap. 33, Illinois Code of 1908, §§ 7, 8, p. 582; *The Monte A*, 12 Fed. Rep. 331, and *The Alida*, 12 Fed. Rep. 343, distinguished; and see *The Ethel*, 66 Fed. Rep. 340; *Dubois* v. *Kirk*, 158 U. S. 58, 67; 1 Cyc. 730.

MR. JUSTICE McKENNA delivered· the opinion of the court.

The case is here on a question of jurisdiction certified by the District Court.

On March 11, 1909, the United States instituted libel proceedings under § 10 of the act of Congress of June 30,

1906, c. 3915, 34 Stat. 768, against fifty cans of preserved whole eggs, which had been prepared by the Hipolite Egg Company of St. Louis, Missouri.

The eggs, before the shipment alleged in the libel, were stored in a warehouse in St. Louis for about five months, during which time they were the property of Thomas & Clark, an Illinois corporation engaged in the bakery business at Peoria, Ill.

Thomas & Clark procured the shipment of the eggs to themselves at Peoria, and upon the receipt of them placed the shipment in their storeroom in their bakery factory along with other bakery supplies. The eggs were intended for baking purposes, and were not intended for sale in the original, unbroken packages or otherwise, and were not so sold. The Hipolite Egg Company appeared as claimant of the eggs, intervened, filed an answer, and defended the case, but did not enter into a stipulation to pay costs.

Upon the close of libellant's evidence, and again at the close of the case, counsel for the Egg Company moved the court to dismiss the libel on the ground that it appeared from the evidence that the court, as a Federal court, had no jurisdiction to proceed against or confiscate the eggs, because they were not shipped in interstate commerce for sale within the meaning of § 10 of the Food and Drugs Act, and for the further reason that the evidence showed that the shipment had passed out of interstate commerce before the seizure of the eggs, because it appeared that they had been delivered to Thomas & Clark and were not intended to be sold by them in the original packages or otherwise.

The motions were overruled and the court proceeded to hear and determine the cause and entered a decree finding the eggs adulterated, and confiscating them. Costs were assessed against the Egg Company.

The decree was excepted to on the ground that the

court was without jurisdiction *in rem* over the subject matter, and on the further ground that the court was without jurisdiction to enter judgment *in personam* against the Egg Company for costs.

The jurisdiction of the District Court being challenged, the case comes here directly.

Section 2 of the Food and Drugs Act prohibits the introduction into any State or Territory from any other State or Territory of any article of food or drugs which is adulterated, and makes it a misdemeanor for any person to ship or deliver for shipment such adulterated article, or who shall receive such shipment, or, having received it, shall deliver it in original unbroken packages for pay or otherwise.

In giving a remedy § 10 provides that if "any article of food that is adulterated and is being transported from one State . . . to another for sale, or, having been transported, remains unloaded, unsold, or in original unbroken packages, . . . shall be liable to be proceeded against in any district court of the United States within the district where the same is found, and seized for confiscation by a process of libel for condemnation. . . . The proceeding of such libel cases shall conform, as near as may be, to the proceedings in admiralty . . . and all such proceedings shall be at the suit of and in the name of the United States."

The shipment to Thomas & Clark consisted of 130 separate cans, each can corked and sealed with wax. The eggs were intended to be used for baking purposes. The only can sold was that sold to the inspector for the purpose of having the eggs analyzed. They contained approximately two per cent of boric acid, which the court found was a deleterious ingredient, and adjudged that they were adulterated within the meaning of the Food and Drugs Act of June 30, 1906, c. 3915, 34 Stat. 771.

The Egg Company, whilst not contending that the

shipment of the eggs was not a violation of § 2 of the act,
and a misdemeanor within its terms, and not denying
the power of Congress to enact it, presents three conten-
tions: (1) Section 10 of the Food and Drugs Act does not
apply to an article of food which has not been shipped for
sale, but which has been shipped solely for use as raw ma-
terial in the manufacture of some other product. (2) A
United States District Court has no jurisdiction to pro-
ceed *in rem* under § 10 against goods that have passed out
of, interstate commerce before the proceeding *in rem* was
commenced. (3) The court had no jurisdiction to enter
a personal judgment against the Egg Company for costs.

It may be said at the outset of these contentions that
they insist that the remedies provided by the statute are
not coextensive with its prohibitions, and hence that it
has virtually defined the wrong and provided no adequate
means of punishing the wrong when committed. Premis-
ing this much, we proceed to their consideration in the
order in which they have been presented. The following
cases are cited to sustain the first contention: *United
States* v. *Sixty-five Casks of Liquid Extracts*, 170 Fed. Rep.
449, affirmed by the Circuit Court of Appeals in *United
States* v. *Knowlton Danderine Company*, 175 Fed. Rep.
1022, and *United States* v. *Forty-six Packages and Boxes of
Sugar*, in the District Court for the Southern District of
Ohio, not yet reported.

The articles involved in the first case were charged with
having been misbranded and consisted of drugs in casks,
which were shipped from Detroit, Michigan, to Wheeling,
West Virginia, there to be received by the Knowlton
Danderine Company in bulk in carload lots and manu-
factured into danderine, of which no sale was to be made
until the casks should be emptied and the contents placed
in properly marked bottles.

It was contended that the articles, not having been
shipped in the casks for the purpose of sale thus in bulk,

but shipped to the owner from one State to another for the purpose of being bottled into small packages suitable for sale, and when so bottled to be labeled in compliance with the requirements of the act, were not transported for sale, and were therefore not subject to libel under § 10 of the act.

The contention submitted to the court the construction of the statute. The court, however, based its decision upon the want of power in Congress to prohibit one from manufacturing a product in a State and removing it to another State "for the purpose of personal use and not sale, or for use in connection with the manufacture of other articles, to be legally branded when so manufactured;" and concluded independently, or as construing the statute, that the danderine company, being the owner of the property, shipped it to itself and did not come within any of the prohibitions of the statute. The case was affirmed by the Circuit Court of Appeals, 175 Fed. Rep. 1022. The court, however, expressed no opinion as to the power of Congress. It decided that the facts did not exhibit a case within the purpose of the statute, saying: "No attempt to evade the law, either directly or indirectly or by subterfuges, has been shown, it appearing that the manufacturer had simply transferred from one point to another the product he was manufacturing for the purpose of completing the preparation of the same for the market. Under the circumstances disclosed in this case, having in mind the object of the Congress in enacting the law involved, we do not think the liquid extracts proceeded against should be forfeited. In reaching this conclusion we do not find it necessary to consider other questions discussed by counsel and referred to in the opinion of the court."

In *United States* v. *Forty-six Packages and Boxes of Sugar* the court construed the statute as applying only to transportation for the purpose of sale. To explain its view the court said: "Following the words 'having been

transported' is an ellipse, an omission of words necessary
to the complete construction of the sentence.   These
words are found in the preceding part of the section and,
when supplied, the clause under which this libel is filed
reads and means, 'any article of food, drug or liquor that
is adulterated or misbranded within the meaning of this
act, having been transported from one State to another
*for sale* [italics ours], remains unloaded, unsold, or in origi-
nal, unbroken packages,   .   .   .   shall be liable,' " etc.
And the court was of opinion that this view was in accord
with the other two cases which we have cited.   This may
be disputed.   It may well be considered that there is no
analogy between an article in the hands of its owner or
moved from one place to another by him, to be used in the
manufacture of articles subject to the statute and to be
branded in compliance with it, and an adulterated article
*itself* the subject of sale and intended to be used as adulter-
ated in contravention of the purpose of the statute.

A legal analogy might be insisted upon if cakes and
cookies, which are the compounds of eggs and flour which
the record presents, could be branded to apprise of their
ingredients like compounds of alcohol.   The object of the
law is to keep adulterated articles out of the channels of
interstate commerce, or, if they enter such commerce, to
condemn them while being transported or when they have
reached their destination, provided they remain unloaded,
unsold or in original unbroken packages.   These situations
are clearly separate, and we cannot unite or qualify them
by the purpose of the owner to be a sale.   It, indeed, may
be asked in what manner a sale?   The question suggests
that we might accept the condition, and yet the instances
of this record be within the statute.   All articles, com-
pound or single, not intended for consumption by the pro-
ducer, are designed for sale, and, because they are, it is
the concern of the law to have them pure.

It is, however, insisted that "the proceeding *in per-*

*sonam* authorized by the law was intended to, and no doubt is, capable of giving full force and effect to the law"; and, further, that a producer in a State is not interested in an article shipped from another State which is not intended to be sold or offered for consumption until it is manufactured into something else.    The argument is peculiar.    It is certainly to the interest of a producer or consumer that the article which he receives, no matter whence it come, shall be pure, and the law seeks to secure that interest, not only through personal penalties but through the condemnation of the article if impure.    There is nothing inconsistent in the remedies, nor are they dependent.    *The Three Friends,* 166 U. S. 1, 49.

The first contention of the Egg Company is, therefore, untenable.

2. Under this contention it is said that "the jurisdiction of the food and drugs act in question can go no farther than the power given to Congress under which it was enacted," and that the District Court, therefore, "had no jurisdiction *in rem* because at the time of the seizure the eggs had passed into the general mass of property in the State and out of the field covered by interstate commerce."

To support the contention, *Waring* v. *The Mayor,* 8 Wall. 110, is cited.    That case involved the legality of a tax imposed by an ordinance of the city of Mobile upon merchants and traders of the city equal to one-half of one per cent on the gross amount of their sales, whether the merchandise was sold at public or private sale.    Waring was fined for non-payment of the tax, and he brought suit to restrain the collection of the fine, alleging that he was exempt from the tax on the ground that the sales made by him were of merchandise in the original packages, as imported from a foreign country, and which was purchased by him, in entire cargoes, of the consignees of the importing vessels before their arrival, or while the vessels were

in the lower harbor of the port. He obtained a decree in
the trial court which was reversed by the Supreme Court
of the State of Alabama. A writ of error was sued out
from this court and the decree was affirmed, on the ground
that Waring was not the shipper or consignee of the im-
ported merchandise, nor the first vendor of it, and it was
the settled law of the court "that merchandise in the
original packages once sold by the importer is taxable as
other property," citing *Brown* v. *Maryland,* 12 Wheat.
443; *Almy* v. *California,* 24 How. 173; *Pervear* v. *Common-
wealth,* 5 Wall. 479. This also was said:

"When the importer sells the imported articles, or
otherwise mixes them with the general property of the
State by breaking up the packages, the state of things
changes, as was said by this court in the leading case, as
the tax then finds the articles already incorporated with
the mass of property by the act of the importer. Im-
porters selling the imported articles in the original pack-
ages are shielded from any such state tax, but the privilege
of exemption is not extended to the purchaser, as the
merchandise, by the sale and delivery, loses its distinctive
character as an import."

This case is clear as far as it goes, but the facts are not
the same as those in the case at bar.

In the case at bar there was no sale of the articles after
they were committed to interstate commerce, nor were the
original packages broken. Indeed, it might be insisted
that we need go no farther than that case for the rule of
decision in this. It affirms the doctrine of original pack-
ages which was expressed and illustrated in previous cases
and has been expressed and illustrated in subsequent ones.
It is too firmly fixed to need or even to justify further
discussion, and we shall not stop to affirm or deny its
application to the special contention of the Egg Company.
We prefer to decide the case on another ground which is
sustained by well-known principles.

The statute declares that it is one "for preventing . . . the transportation of adulterated . . . foods . . . and for regulating traffic therein;" and, as we have seen, § 2 makes the shipper of them criminal and § 10 subjects them to confiscation, and, in some cases, to destruction, so careful is the statute to prevent a defeat of its purpose. In other words, transportation in interstate commerce is forbidden to them, and, in a sense, they are made culpable as well as their shipper. It is clearly the purpose of the statute that they shall not be stealthily put into interstate commerce and be stealthily taken out again upon arriving at their destination and be given asylum in the mass of property of the State. Certainly not, when they are yet in the condition in which they were transported to the State, or, to use the words of the statute, while they remain "in the original, unbroken packages." In that condition they carry their own identification as contraband of law. Whether they might be pursued beyond the original package we are not called upon to say. That far the statute pursues them, and, we think, legally pursues them, and to demonstrate this but little discussion is necessary.

The statute rests, of course, upon the power of Congress to regulate interstate commerce, and, defining that power, we have said that no trade can be carried on between the States to which it does not extend, and have further said that it is complete in itself, subject to no limitations except those found in the Constitution. We are dealing, it must be remembered, with illicit articles—articles which the law seeks to keep out of commerce, because they are debased by adulteration, and which law punishes them (if we may so express ourselves) and the shipper of them. There is no denial that such is the purpose of the law, and the only limitation of the power to execute such purpose which is urged is that the articles must be apprehended in transit or before they have become a part

of the general mass of property of the State. In other words, the contention attempts to apply to articles of illegitimate commerce the rule which marks the line between the exercise of Federal power and state power over articles of legitimate commerce. The contention misses the question in the case. There is here no conflict of national and state jurisdictions over property legally articles of trade. The question here is whether articles which are outlaws of commerce may be seized wherever found, and it certainly will not be contended that they are outside of the jurisdiction of the National Government when they are within the borders of a State. The question in the case, therefore is, What power has Congress over such articles? Can they escape the consequences of their illegal transportation by being mingled at the place of destination with other property? To give them such immunity would defeat, in many cases, the provision for their confiscation, and their confiscation or destruction is the especial concern of the law. The power to do so is certainly appropriate to the right to bar them from interstate commerce, and completes its purpose, which is not to prevent merely the physical movement of adulterated articles, but the use of them, or rather to prevent trade in them between the States by denying to them the facilities of interstate commerce. And appropriate means to that end, which we have seen is legitimate, are the seizure and condemnation of the articles at their point of destination in the original, unbroken packages. The selection of such means is certainly within that breadth of discretion which we have said Congress possesses in the execution of the powers conferred upon it by the Constitution. *McCulloch* v. *Maryland,* 4 Wheat. 316; *Lottery Case,* 188 U. S. 321, 355.

3. Had the court jurisdiction to adjudge costs against the Egg Company? This is contended, and in support of the contention the claimant assimilates this proceed-

ing to one in admiralty.  In consequence, it may be supposed of the provisions of § 10 of the Food and Drugs Act that the proceedings "shall conform, as near as may be, to the proceedings in admiralty," and *The Monte A*, 12 Fed. Rep. 331, and *The Alida*, 12 Fed. Rep. 343, are cited as deciding that in a proceeding *in rem* the court has no jurisdiction to assess the costs *in personam* against the claimant, who simply files an answer, but who does not enter into a stipulation to pay the costs of the proceeding.  Too broad a deduction is made from these cases. They undoubtedly decide that a process *in rem* and *in personam* cannot be joined in admiralty in the same libel, but it was not held that this was because of a want of jurisdictional power in the court.  Such view was disclaimed in *The Monte A*, and to show that the framing of a libel against the owner *in personam* and against the vessel *in rem* was not jurisdictional, the court said that a breach of a contract of affreightment could have been so framed "long before the adoption of the Supreme Court rules in admiralty."

It is stated in Benedict's Admiralty, § 204, that "the distinction between proceedings *in rem* and *in personam* has no proper relation to the question of jurisdiction." It may be, as stated in § 359 of the same work, that "in a suit *in rem*, unless some one intervenes, the power and process of the court is confined to the thing itself and does not reach either the person or property of the owner." If, however, the owner comes in, or an intervenor does, his appearance is voluntary.  He becomes an actor and subjects himself to costs, and this even if his ownership be averred in the libel.  Waple Proceedings In Rem, page 100, § 73; *United States* v. *422 Casks of Wine*, 1 Pet. 547.

And such seems to be the necessary effect of Admiralty Rules 26 [1] and 34.[1]  It is provided (Rule 34) that if a third

---

[1] For these Rules in full see 210 U. S. 552, 554.

person intervene, for his own interest, he is required to give a stipulation with sureties to abide the final decree rendered in the original or appellate court. It is in effect conceded that if such a stipulation be given, a judgment for costs can be rendered. But, upon what theory? The concession confounds the relation between the stipulation and the judgment, and makes the security for the payment of the judgment the source of jurisdiction to render it—jurisdiction according to the contention, which the court does not have as a Federal court.

Even, therefore, upon the supposition that the principles of the admiralty law are to apply to the proceedings under § 10, we think the court had jurisdiction to render a judgment for costs against the Egg Company.

So far our discussion has been in deference to the contention of the Egg Company, but it is disputable if the certificate presents a question of jurisdiction as to costs. The District Court gets its jurisdiction of the cause from § 10 of the Food and Drugs Act, and whether the libel may be *in rem* and *in personam*, or whether a personal judgment for costs can be rendered, may be said to be simply a question of the construction of the section, and not one which involves the jurisdiction of the court. In other words, the rulings of the court may be error only, not in excess of its power. It certainly had jurisdiction of the person of the Egg Company.

*Decree affirmed.*