### PHILADELPHIA PICKLING CO. v. UNITED STATES.

(Circuit Court of Appeals, Third Circuit. January 31, 1913.)

#### No. 1,704.

1. Food (§ 12*)—Food and Drugs Act—Offenses—Shipment of Adulterated Food.

Under Food and Drugs Act June 30, 1906, c. 3915, § 2, 34 Stat. 768 (U. S. Comp. St. Supp. 1911, p. 1354), which prohibits "the introduction into any state * * * of any article of food * * * which is adulterated," and makes it an offense for any person to "ship or deliver for shipment" from one state to another such adulterated food, it is not a defense to a prosecution for making such a shipment that the articles were not shipped for sale, where the shipment was for any business purpose which constituted interstate commerce.

[Ed. Note.—For other cases, see Food, Dec. Dig. § 12.*]

2. Food (§ 12*)—Food and Drugs Act—Offenses—Shipment of Adulterated Food.

Defendant shipped an adulterated tomato paste from its place of business in New Jersey to itself at its other place of business in Pennsylvania, for the purpose of having it there tested with a view to its export to England if it conformed to the English standard, which would have been lawful under the proviso in Food and Drugs Act June 30, 1906, c. 3915, § 2, 34 Stat. 768 (U. S. Comp. St. Supp. 1911, p. 1354). It failed to meet the test and was destroyed, not being used nor sold. *Held*, that its shipment was in interstate commerce, and constituted an offense under said section of the act.

[Ed. Note.—For other cases, see Food, Dec. Dig. § 12.*

What constitutes a violation of pure food regulations, see note to Brina v. United States, 105 C. C. A. 559.]

In Error to the District Court of the United States for the District of New Jersey; John Rellstab, Judge.

The Philadelphia Pickling Company was convicted of a violation of the Food and Drugs Act, and brings error. Affirmed.

Wilson & Carr, of Camden, N. J., for plaintiff in error.

John B. Vreeland, of Morristown, N. J., and Walter H. Bacon, of Bridgeton, N. J., for the United States.

Before GRAY, BUFFINGTON, and McPHERSON, Circuit Judges.

J. B. McPHERSON, Circuit Judge. [1] The Philadelphia Pickling Company was convicted under section 2 of the Food and Drugs Act of

1906, the indictment charging a shipment of adulterated tomato paste from the company's place of business in New Jersey to its place of business in Pennsylvania. Other facts will appear in a few moments; but it seems advisable to consider in advance the general question: Does the act apply where the owner has shipped to himself for some other business purpose than sale? The trial judge directed the verdict, but no complaint is made of this, if his construction of the act was correct.

The statute imposes penalties in three sections, but we are concerned only with sections 2 and 10. The latter section provides for condemnation, and permits an offending article to be seized, if it—

"is being transported from one state, territory, district, or insular possession to another for sale; or having been transported remains unloaded, unsold, or in original unbroken packages; or if it be sold or offered for sale in the District of Columbia, or the territories, or insular possessions of the United States; or if it be imported from a foreign country for sale; or if it is intended for export to a foreign country."

This section speaks repeatedly of sale, and the courts have had several occasions to consider what Congress meant by the language quoted. In United States v. 65 Casks (D. C.) 170 Fed. 449, it appeared that the casks in question (which were insufficiently marked) contained a liquid that had been manufactured and shipped by the owner's agent in Michigan to the owner himself in West Virginia for the primary purpose of being bottled and properly labeled there. It was not to be sold until this had been done, and the District Court held inter alia (pages 445, 446) that Congress—

"did not * * * have power to restrict one from manufacturing in one state such product and removing it from that state to another for the purpose of personal use and not sale, or for use in connection with the manufacture of other articles to be legally branded when so manufactured."

The Court of Appeals affirmed the judgment in a brief opinion (175 Fed. 1022, 99 C. C. A. 667), which is silent concerning the power of Congress, and merely gives the following reason for affirmance:

"No attempt to avoid the law, either directly, indirectly, or by subterfuge, has been shown; it appearing that the manufacturer had simply transferred from one point to another the product he was manufacturing for the purpose of completing the same for the market. Under the circumstances disclosed in this case, having in mind the object of the Congress in enacting the law involved, we do not think the liquid extract proceeded against should be forfeited. Reaching this conclusion, we do not find it necessary to consider other questions discussed by counsel and referred to in the opinion of the court below."

In United States v. 46 Packages (D. C.) 183 Fed. 642, it was held that a libel in rem under section 10 was defective, because it failed to aver that the articles seized were transported "for sale." The foregoing cases are referred to in Hipolite Egg Co. v. United States, 220 U. S. 45, 31 Sup. Ct. 364, 55 L. Ed. 364, and although they are not definitely disapproved they are certainly not accepted as correct. At the best, they are noticed with a word or two of comment, and of course they must yield if they clash with the decision or the opinion of the Supreme Court. One of the points decided in the Hipolite Case

is that section 10 permits the condemnation of adulterated food, although it has not been transported for sale directly, but is intended solely for use as raw material in the manufacture of another product. This is clear, for the court on page 52 of 220 U. S., on page 365 of 31 Sup. Ct. (55 L. Ed. 364), states the first contention of the Egg Company to be that:

"Section 10 of the Food and Drugs Act does not apply to an article of food which has not been shipped for sale, but which has been shipped solely for use as raw material in the manufacture of some other product."

And this contention is declared (page 55 of 220 U. S., on page 366 of 31 Sup. Ct. [55 L. Ed. 364]) to be "untenable."

But the reasoning that supports this declaration goes farther, we think, than the precise point decided. We may perhaps venture to give an outline of the argument: Congress has taken away from adulterated food the right to be transported in interstate commerce, whatever the object of such transportation may be. The act has two clearly separate objects (220 U. S. 54, 31 Sup. Ct. 364, 55 L. Ed. 364): First, to keep adulterated articles completely out of the channels of interstate commerce; and, second, if they do enter such channels, to sanction their condemnation while being transported, or even after they have reached their destination, as long as they remain unloaded, unsold, or in original unbroken packages. These objects of the act are not changed or qualified by the purpose of the owner. He may, or may not, intend to sell. If he so intend, perhaps he may also intend that the articles shall first undergo a further process of manufacture; but, even if the latter intention be present, he would still be transporting for sale. Therefore, even if the "condition" (contention?) be accepted that section 10 does not allow condemnation unless such articles are transported for sale, nevertheless the facts of the case then being considered showed that a "sale" was intended. Not directly, it is true, but only one step removed'; for the eggs were intended to be used in making cakes for the market, and were therefore to be sold as a part of the cake. The court points out that all articles, compound or single, not intended for consumption by the producer, are designed for sale, and because they are so designed it is the concern of the law to have them pure.

One of the Egg Company's arguments—that a producer in one state is not interested in an article shipped from another state, if such article be not intended for sale or consumption until it is manufactured into something else—is said to be "peculiar." The court declares that both the producer and the consumer are interested in having an article pure, no matter whence it may come, and that the law seeks to protect such interest both by the personal penalties of section 2 and by the seizure and condemnation under section 10.

This is in outline the court's reply to the Egg Company's first position; but we think the attitude of that tribunal appears even more clearly in the discussion of the company's second position, which was:

"That at the time of the seizure the eggs had passed into the general mass of property in the state, and out of the field covered by interstate commerce."

The containers had been stored at the company's bakery among other supplies, but the original packages has not been broken. It was held that Congress might pursue the packages into the bakery and might seize them there. The offending articles had not escaped, although they had reached their destination, and had already become part of a larger collection of supplies. The act had forbidden the transportation of adulterated food, and not only had made the shipper subject to penalties, but had made even the goods themselves so far culpable as to be liable to seizure in rem:

"It is clearly the purpose of the statute that they shall not be stealthily put into interstate commerce, and be stealthily taken out again upon arriving at their destination, and be given asylum in the mass of property of the state. Certainly not, when they are yet in the condition in which they were transported to the state. or, to use the words of the statute, while they remain 'in the original, unbroken packages.' In that condition they carry their own identification as contraband of law. Whether they might be pursued beyond the original package we are not called upon to say. That far the statute pursues them, and, we think, legally pursues them, and to demonstrate this but little discussion is necessary."

And one characteristic of adulterated food is thus insisted upon, with the legal consequences that flow therefrom:

"We are dealing, it must be remembered, with illicit articles—articles which the law seeks to keep out of commerce, because they are debased by adulteration, and which law punishes them (if we may so express ourselves), and the shipper of them. There is no denial that such is the purpose of the law, and the only limitation of the power to execute such purpose which is urged is that the articles must be apprehended in transit or before they have become a part of the general mass of property of the state. In other words, the contention attempts to apply to articles of illegitimate commerce the rule which marks the line between the exercise of federal power and state power over articles of legitimate commerce. The contention misses the question in the case. There is here no conflict of national and state jurisdictions over property legally articles of trade. The question here is whether articles which are outlaws of commerce may be seized wherever found, and it certainly will not be contended that they are outside of the jurisdiction of the national government when they are within the borders of a state. The question in the case therefore is: What power has Congress over such articles? Can they escape the consequences of their illegal transportation by being mingled at the place of destination with other property? To give them such immunity would defeat, in many cases, the provision for their confiscation, and their confiscation or destruction is the especial concern of the law. The power to do so is certainly appropriate to the right to bar them from interstate commerce, and completes its purpose, which is not to prevent merely the physical movement of adulterated articles, but the use of them, or rather to prevent trade in them between the states by denying to them the facilities of interstate commerce. And appropriate means to that end, which we have seen is legitimate, are the seizure and condemnation of the articles at their point of destination in the original, unbroken packages."

We have examined this case at such length, because it seems to us that, if our understanding of the court's reasoning be correct, the decision of the present controversy is inevitably foreshadowed. It is true that this is a prosecution under section 2, and not a seizure under section 10; but the difference (if important) is in favor of section 2, for its meaning is not restricted by the words "for sale," and is therefore even broader than the language of section 10. One of the chief objects of the act is declared in section 2, namely, to forbid *"the intro-*

*duction* into any state or territory," etc., "of any article of food
* * * which is adulterated"; and, while the section does not at-
tempt to punish criminally every method of "introduction," it does
punish the method here in question—"any person who shall *ship or
deliver for shipment* from any state or territory," etc., "shall be guilty
of a misdemeanor," etc.—and the breadth of the prohibition justifies
us at least in refusing to narrow the ordinary meaning of the words
that define the crime. · Of course, the shipment must be in the way
of "commerce." Such a limitation is constitutionally necessary; but,
if the limitation be assumed, no reason is perceived why "shipment"
should be construed to mean "shipment for sale." Its ordinary mean-
ing in this connection covers any shipment for any purpose in the
course of commerce, and we accept this as the intended scope of the
word. And the correctness of such construction seems more probable .
when we observe that the next penal clause of section 2 should ap-
parently be construed in a similar manner.. This clause applies to any
person "who shall receive in any state or territory," etc., "and, having
so received, shall deliver in original unbroken packages, * * * or
[shall] offer to deliver, to any person any such article so adulterated"
—the delivery being punished, whether it be "for pay *or otherwise*."
In other words, to receive and deliver offending articles in the course
of commerce is indictable, whatever the business purpose may be.

The Court of Appeals of the Second Circuit in United States v. 300
Cans, 189 Fed. 352, 111 C. C. A. 83, has also ruled that, since the
Hipolite decision at all events, a libel for condemnation need no long-
er aver that the articles were transported for sale—the food there in
question having been shipped from Nebraska by the owner to himself
in New York, and remaining unsold in original unbroken packages.

[2] The facts of the present dispute are these: The defendant has
two places of business, one in New Jersey and one in Pennsylvania.
The adulterated tomato paste in question was at the New Jersey
house, and was shipped to Philadelphia in order to be examined and
tested in that city. The test was necessary, because a customer in
London had sent an order, and the paste, unless it could meet the
English standard, would not fill the customer's requirements. It was
not to be sold or used for food in Philadelphia, and it was not so sold
or used; but, having failed to meet the English test, it was immedi-
ately destroyed, without attempt to use or sell. The test was not made
in New Jersey, because facilities for making it there were lacking. The
sale would have been completed in Philadelphia, and the shipment for
export would have been made from that city, if the paste had met the
English test; and in that event the paste (although it might have been
adulterated according to the United States standard) would not have
been subject to seizure by this government, if it had been "prepared `
or packed according to the specifications or directions of the foreign
purchaser," etc. (See *proviso to section 2*.) That an ultimate sale
was a possibility, when the shipment was made in New Jersey, is not
a decisive consideration; for the sale was never made, and, of course,
the goods were never prepared or packed for export. But the Eng-
lish order does have this bearing; it explains why the interstate move-

ment took, place, and shows that the reason was a trade or business reason, and therefore that the movement was in the course of commerce.

In our opinion it was interstate commerce for the owner to ship the goods from New Jersey to Pennsylvania for a business purpose such as examination and test; and as the goods were adulterated such a shipment was unlawful.

The judgment is affirmed.