**UNITED STATES v. CATZ AMERICAN CO., Inc.**

No. 6498.

Circuit Court of Appeals, Ninth Circuit.

Nov. 2, 1931.

Rehearing Denied Dec. 7, 1931.

SAWTELLE, Circuit Judge, dissenting.

Geo. J. Hatfield, U. S. Atty., and William A. O'Brien, Asst. U. S. Atty., both of San Francisco, Cal., for appellant.

Norman A. Eisner, of San Francisco, Cal., for appellee.

Before WILBUR and SAWTELLE, Circuit Judges, and JAMES, District Judge.

JAMES, District Judge.

Appellant brought its libel in the District Court seeking a decree condemning approximately 2,000 sacks of "Cull" dried figs which were found at the dock in San Francisco ready to be loaded aboard ship, with initial destination Trieste, Italy. It was charged in the libel that the shipment consisted partly of "filthy, decomposed or putrid vegetable matter," and was subject to seizure under the Food and Drugs Act.

The answer of appellee admitted that the figs were "culls," and that without further segregation or processing they were not fit to be used as food. It was further alleged in the answer that the figs had actually been placed in transit, consigned to a buyer in Austria.

Trial was had, and there was no conflict in the evidence as to matters material to the issues. In brief, appellee, a dealer in dried figs, had prepared the fruit to meet an order for that particular kind and quality of figs; the order being received from an Austrian manufacturer who processed like fruit to make a coffee flavoring. The figs were wormy in part. Appellee had made shipments of many tons of the same kind of figs to the same buyer during the preceding four years. The District Court found that the facts, under the law appealed to, did not show a cause for the decree demanded. This decision, we believe, was right.

The Food and Drugs Act (21 USCA §§ 1–25) contains many provisions respecting adulteration and misbranding of articles of food and drugs, and the shipment of the same in interstate commerce. Section 2 forbids the introduction into any state or territory from another state or territory, or from a foreign country, or the shipment to a foreign country, of any article of food or drugs adulterated or misbranded within the meaning of the law. This section provides that the offender shall be guilty of a misdemeanor and subject to a fine for the first offense and fine or imprisonment, or both, for a subsequent offense. The concluding portion of the section reads as follows: "No article shall be deemed misbranded or adulterated within the

426

provisions of said sections when intended for export to any foreign country and prepared or packed according to the specifications or directions of the foreign purchaser when no substance is used in the preparation or packing thereof in conflict with the laws of the foreign country to which said article is intended to be shipped; but if said article shall be in fact sold or offered for sale for domestic use or consumption, then this proviso shall not exempt said article from the operation of any of the other provisions of the sections hereinbefore enumerated."

Section 8 provides that: "For the purposes of sections 1 to 15, inclusive, of this title, an article shall be deemed to be adulterated: * * * Sixth. If it consists in whole or in part of a filthy, decomposed, or putrid animal or vegetable substance. * * *"

Section 8, in the part quoted, furnishes the definition of an "adulterated" article of food. The exception is, as is specified in that portion of section 2 quoted, that articles of food shall not be deemed "adulterated" when intended for export to a foreign country, and prepared or packed according to directions of the foreign purchaser, and where no substance is used in the preparation or packing which is in conflict with the laws of the country to which the article is intended to be shipped. Construed together, these provisions seem intended to allow the shipment to a foreign country of products which are not up to the requirements imposed upon interstate shipments where the foreign purchaser has ordered the precise kind and quality which the exporter designs to send to him, so long as the law of the country to which they are being sent does not impose similar restrictions as to substances "used in the preparation or packing thereof." The words "prepared or packed" should be held to mean any condition or grade of the merchandise, including any deteriorated state of the goods, considering the class to which they belong. The law thus interpreted (and we feel that the language used is fairly expressive to the intent indicated), the libel did not show that the merchandise seized was subject to forfeiture.

The certificate introduced by appellant in the trial court, showing the provisions of an Austrian law as prohibiting certain impure materials being used in coffee admixtures and coffee substitutes, could not have the effect to put the shipper here out of the excepted class, as showing that he had used a substance in the preparation and packing of the fruit "in conflict with the laws of the foreign country to which said article is intended to be shipped." Section 2 above cited. The manufacturer, upon receiving the figs, might well free them from all the deleterious matter before converting them into coffee flavoring, or he might divert them to other proper uses if they were unfit for such purpose. In the absence of evidence to the contrary, it will be assumed that he will comply with the law of Austria.

The decree is affirmed.

SAWTELLE, Circuit Judge (dissenting).

I am unable to agree with the majority in the view that the saving provision of section 2 of the Food and Drugs Act protects from seizure shipments of decayed food in its "natural condition," to use the expression reiterated by the appellee. The saving provision relates solely to articles "prepared or packed" according to the directions of the foreign purchaser; it does not authorize shipment of food inherently "adulterated" by being, according to section 8, "filthy, decomposed, or putrid." That section defines the word "adulterated" as follows:

"For the purposes of sections 1 to 15, inclusive, of this title, an article shall be deemed to be adulterated; * * *

"Sixth. If it consists in whole or in part of a filthy, decomposed, or putrid animal or vegetable substance, or any portion of an animal unfit for food, whether manufactured or not, or if it is the product of a diseased animal, or one that has died otherwise than by slaughter."

The government is not quarreling with the method either of "packing" or "preparing" the figs; it is censuring a vice that inheres in the food itself, regardless of its "packing" or "preparation"; namely, its essential putridity.

The word "prepare" implies the intervention of human agency. It does not mean the mere permission that nature takes its course. Shipping rotten figs in their "natural condition" is not "preparing" or "packing" them.

The test seems to be: Did the "preparing" or the "packing," of itself, cause the condition to which the government is objecting?

In other words, did the "preparing" or the "packing" of the fruit result in its adulteration or decay? We are assuming, for the sake of the argument only, that such prepar-

ing and packing were done according to the instructions of the foreign purchaser.

If it should be found that the putrid condition of the figs was due to the method used in packing or preparing them, the saving provision referred to above applies, and the shipment is not subject to condemnation.

If, on the other hand, it is ascertained that the fruit was "adulterated" because of natural decay—in which the hand of man had no part—then the vice complained of may be said to be inherent, and to render the shipment subject to seizure by the government.

In Thomas and Wife v. Winchester, cited by the appellee itself, 6 N. Y. 397, 411, 57 Am. Dec. 455, the court thus defined "prepared": "The word 'prepared' on the label, must. be understood, to mean that the article was manufactured by him, or that it had passed through some process under his hands, which would give him personal knowledge of its true name and quality."

It may well be asked here, What "process" was used by the appellee to cause the figs to become decayed? The answer is found in the appellant's own statement, that the fruit was shipped in its "natural condition." Therefore there was no "preparation" on appellee's part.

Whatever might be the government's action against the shipper, its suit here is against the shipment; and in such a case the construction is strict as against the shipment: "The rule of strict construction [in favor of the allegedly offending shipper] invoked by the defendant in error has little or no application to statutes designed to promote the public health or public safety." A. O. Andersen & Co. v. United States (C. C. A. 9) 284 F. 542, 543.

Finally, the record shows that the law of Austria does "impose similar restrictions as to substances 'used in the preparation and packing' " of "products which are not up to the requirements imposed upon interstate shipments," even if the foreign consignee "has ordered the precise kind and quality which the exporter designs to send to him": "Other ground coffee admixtures and coffee substitutes. These products must contain no coarse fragments, coming from stems or cores and the like of the products used for this purpose, and must be free from molds, insects, and their maggots." Official Compilation of the Regulations of the Republic of Austria on Alimentary Foods, published by the Austrian Federal Ministry of Social Administration, Public Health Office, in Vienna.

The majority of the court seeks to answer this objection, at the conclusion of its opinion, by assuming that the "manufacturer, upon receiving the figs, might well free them from all the deleterious matter before converting them into coffee flavoring, or he might divert them to other proper uses if they were unfit for such purpose."

I do not think that the jurisprudence under the statute authorizes such an assumption. It is true that the cases that I am about to cite deal with interstate and not foreign shipments; but, since it is admitted that this is a case of first impression, the reasoning in those cases can properly, by analogy, be extended to the case at bar.

We are here concerned with the condition of the shipment as it leaves our shores, and not with what may be done to the merchandise after it has arrived at its foreign destination.

In United States v. Thirteen Crates of Frozen Eggs (C. C. A. 2) 215 F. 584, 585, the court said: "The question of intent of either the shipper or the consignee has nothing to do with the question."

In the lower court, in that case, the "intent" of both the shipper and the consignee was clearly shown, but such intent did not prevent the condemnation of the shipment: "Eggs in this condition may be sold and used as an article of food, or for tanning purposes (that is, for use in the tanning of leather), and claimant had sold eggs of this description, selected and segregated at the same time as these, to a tannery or tanning firm located and doing business at a point not far distant from Chicago for tanning purposes. It had not shipped or sold any of its eggs of this description to be used and consumed as an article of food and did not contemplate doing so." 208 F.(2d) 950, 951.

As was said by the District Judge in that case, "the purpose of Congress was to prohibit the transportation of articles in interstate commerce which come within the definition given in the statute and make them subject to seizure and condemnation if so transported." See, also, United States v. Two Barrels of Desiccated Eggs (D. C.) 185 F. 302; Union Dairy Co. v. United States (C. C. A. 7) 250 F. 231, 233; United States v. Ninety-four Dozen, More or Less, Half-Gallon Bottles Capon Springs Water (D. C.) 48 F.(2d) 378, 379, 381.

In Hipolite Egg Co. v. United States, 220 U. S. 45, 52, 55, 31 S. Ct. 364, 55 L.

Ed. 364, the Supreme Court branded as "untenable" the egg company's contention that "section 10 of the food and drugs act [21 USCA § 14] does not apply to an article of food which has not been shipped for sale, but which has been shipped solely for use as raw material in the manufacture of some other product."

"The object of the law," the court said, "is to keep adulterated articles out of the channels of interstate commerce, or, if they enter such commerce, to condemn them while being transported or when they have reached their destination, provided they remain unloaded, unsold, or in original unbroken packages."

On page 58 of the opinion in 220 U. S., 31 S. Ct. 364, 367, the Supreme Court brands articles debased by adulteration as being "outlaws of commerce."

This apt characterization fits a shipment of wormy figs, and the fact that such shipment is destined for a foreign port does not divest it of its outlaw nature.

Accordingly, I am of the opinion that the decree should be reversed.