## UNITED STATES v. 52 DRUMS MAPLE SYRUP, etc.

### No. 264.

Circuit Court of Appeals, Second Circuit.
April 8, 1940.

Joseph A. McNamara, U. S. Atty., of Burlington, Vt., and Charles F. Ryan, Asst. U. S. Atty., of Rutland, Vt., for plaintiff-appellant.

Arthur L. Graves and William S. Burrage, both of St. Johnsbury, Vt., for claimant-appellee.

Before L. HAND, CHASE, and CLARK, Circuit Judges.

CHASE, Circuit Judge.

The appellant is here seeking the reversal of judgments for the claimant in condemnation proceedings under the Pure Food and Drugs Act on the sole ground that during a trial by jury reversible error was committed in the admission of evidence offered by the claimant.

The government seized at St. Johnsbury, Vt., a number of steel drums containing maple syrup which had concededly been shipped there at various times in interstate commerce in carload lots with other drums of such syrup. Libels in proceedings for the condemnation of the syrup under the provisions of the Pure Food and Drugs Act (Secs. 8(5) and 14 of 21 U.S.C.A.) were duly filed and the appellee, appearing as the claimant of all the syrup, answered each libel. The several proceedings were consolidated for trial by jury in the district court where a verdict was returned for the claimant in each proceeding and judgment thereon entered. This appeal followed. There was the same consolidation of causes for hearing on appeal.

The claimant processes maple sugar and syrup and manufactures maple sugar products therefrom at its plant in St. Johnsbury, Vt. It bought the maple syrup which was seized outside Vermont and caused it to be shipped to its plant at St. Johnsbury to be used as a raw material in its business but not to be sold or otherwise used until it had been processed.

The evidence clearly established that in making maple syrup by evaporating water

from the maple sap rather minute amounts of lead do get into the syrup from lead in the paint and in the solder and sometimes, perhaps, in the composition, of the utensils used in the process. This lead is a poisonous substance and a comparatively small amount will make the syrup, which is a food within the meaning of the statute, a food dangerous to health. The government has established what is called a working tolerance of .025 grains of lead per pound which for present purposes may be treated as the maximum amount of lead maple syrup may contain without being barred from interstate shipment.

██ It was claimed by the government that the syrup which was seized contained, when shipped in interstate commerce, added lead to an amount which made it an adulterated food within the meaning of Sec. 8 (5) of 21 U.S.C.A., and subject to seizure and condemnation when moved in interstate commerce. The claimant denied that the government's proof was sufficient to establish the claimed adulteration and also contended that the statute did not apply to the seizures for other reasons of which we need now notice particularly only one. As for the other issues, it is enough to say that the government introduced evidence that required a submission of them to the jury. There was at least enough to have supported findings by the jury that the syrup seized was an article of food to which a poisonous ingredient, lead, had been added which might render such article injurious to health. And so it cannot be held as a matter of law that the error mainly relied on upon this appeal was not substantial on the ground that the claimant was entitled to directed verdicts in any event.

██ During the trial the claimant strenuously insisted that the statute above mentioned did not apply to these seizures because if any of the syrup contained more lead when received by the claimant than the statute permitted all the excess in each instance would have been removed by the claimant before it sold or otherwise disposed of the syrup. Its intention so to do was established with emphasis when the court permitted the claimant to show at great length the care that it always exercised to make its products pure and the co-operation it gave the agency of the government charged with the administration

of the Pure Food and Drugs Act. If the statute did not apply to the interstate shipment of food which, though adulterated, was to be made pure within the statutory meaning before being otherwise disposed of in any way, the claimant not only presented an adequate defense but undoubtedly proved affirmatively that the libels were unfounded. But that was a wholly false issue. The intended use to which adulterated food is to be put after it has been shipped in interstate commerce is immaterial on the question of the government's right to forfeit because of such shipment. United States v. Thirteen Crates of Frozen Eggs, D.C., 208 F. 950; Affirmed, 2 Cir., 215 F. 584; Hipolite Egg Co. v. United States, 220 U.S. 45, 31 S.Ct. 364, 55 L.Ed. 364. The introduction of a comparatively large amount of evidence in support of this false issue to show that the syrup was to be deleaded before any part of it was used as a food served to create an atmosphere so permeated with the general idea of the claimant's business rectitude that it is not at all unlikely that the condemnation proceedings were made to assume the nature of an unjust prosecution.

Accordingly, it cannot be said with any assurance whatever that the harm was undone by submitting to the jury, as the court did, only one issue of fact and that as to whether or not the lead content of the syrup when shipped was above or below what might be injurious to health. There was not the slightest attempt to inform the jury that what the claimant intended to do with the syrup was of no consequence and that the evidence which had been admitted as to that should be given no consideration. The jury was merely left to decide on conflicting evidence whether the syrup was adulterated within the meaning of the statute; and to do so after a trial in which it had been made all too plain that no matter how much lead was in the syrup when shipped none of consequence would remain there when the claimant was through putting it into the form in which the public would get it to eat. Under such circumstances, only the most credulous could believe that the action of the jury was not based largely upon the false issue created by the evidence erroneously admitted during the trial.

Judgment reversed.