## ROYAL BAKING POWDER CO. v. EMERSON, Pres. Atty.

(Circuit Court of Appeals, Eighth Circuit. November 5, 1920. Rehearing Denied December 29, 1920.)

No. 5575.

1. **Courts** ⬿292—**Suit to protect trade-name within jurisdiction of federal court.**

   A suit to protect complainant's right to use an established trade-name or brand, alleged to be of the value of more than $3,000, *held* within the jurisdiction of a federal court.

2. **Injunction** ⬿105 (1)—**May be granted to restrain criminal prosecutions.**

   Equity may enjoin criminal prosecutions where a multiplicity of such prosecutions are threatened either under an invalid statute or which are not authorized by statute.

⬿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. **Food ☞½, New, vol. 15 Key-No. Series—Baking powder an "article of food."**

Baking powder *held* an "article of food," within the meaning of Pure Food and Drugs Act Ark. May 28, 1907 (Kirby & Castle's Dig. § 6369 et seq.), making it an offense to misbrand "any article of food."

4. **Food ☞15—Criminal liability for violation of Arkansas Pure Food Act.**

Under Pure Food and Drugs Act Ark. May 28, 1907 (Kirby & Castle's Dig. § 6369 et seq.), the seller of a misbranded article of food is subject to criminal prosecution.

5. **Food ☞1—Scope of state legislation.**

Where a state law is not in conflict with the national Food and Drugs Act a broad latitude is allowed states in protecting their citizens from adulterated or misbranded articles.

6. **Appeal and error ☞895(3)—Admission of improper evidence in equity suit harmless error.**

Where an equity suit is heard de novo in the appellate court the admission of improper evidence by the trial court is harmless error.

7. **Food ☞15—Test of misbranding is deception of purchasers.**

The purpose of a statute against misbranding of food articles is to prevent deception through a label or brand, and to ascertain whether a given label would act deceptively, the attitude of the average buyer toward that product at the period the label is put out may be examined.

8. **Food ☞15—Baking powder held "misbranded."**

Where complainant, manufacturer of "Price's Cream Baking Powder," had for many years advertised the fact that its product was made with cream of tartar, and contained no phosphate nor alum, claiming superiority and greater healthfulness on that ground, by which means it had acquired a high reputation for its product and a valuable good will, its continued use, after it had substituted phosphate for cream of tartar therein, of labels on its cans bearing the same name and having the same coloring, style of printing, and general appearance as those previously used, which would be accepted by the average purchaser accustomed to its product as denoting the same article, *held* a misbranding, although it truthfully stated the ingredients in an inconspicuous place on the back of the can, and although for a new and unknown product the label might not be objectionable.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Misbrand—Misbranding.]

9. **Food ☞15—Failure to effectively inform purchasers of change in article constitutes misbranding.**

If the manufacturer of a product or article of established reputation makes a change in the article, and that change be of a character which would, considering all the attendant circumstances, naturally affect the attitude of purchasers of that article, fair dealing and the law require that such purchasers be effectively informed of that change.

10. **Words and phrases—"Baking powder."**

"Baking powder" is a mixture in dry form of certain alkali and acid substances, combined with a filler; and when moistened and heated, as in baking dough, a chemical reaction occurs, which liberates carbonic gas, which "raises" or leavens bread.

Appeal from the District Court of the United States for the Eastern District of Arkansas; Jacob Trieber, Judge.

Suit in equity by the Royal Baking Powder Company against George W. Emerson, as Prosecuting Attorney. From the decree, complainant appeals. Affirmed.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Archibald Cox, of New York City (John M. Moore, of Little Rock, Ark., and Samuel W. Fordyce, Jr., of St. Louis, Mo., on the brief), for appellant.

T. M. Mehaffy and J. F. Loughborough, both of Little Rock, Ark., and John D. Arbuckle, Atty. Gen. (James Love Hopkins, of St. Louis, Mo., on the brief), for appellee.

Before HOOK and STONE, Circuit Judges, and JOHNSON, District Judge.

STONE, Circuit Judge. Appellant has been for years a manufacturer and seller of a baking powder known as "Dr. Price's Cream Baking Powder." Until recently this powder was what is known as a cream of tartar powder, as distinguished from phosphate powders or alum powders. A few months before this action was commenced this powder had been changed to a phosphate powder, by entire substitution of phosphate for cream of tartar as the acid ingredient. Appellant thereupon altered the labels upon the cans of this powder in an attempt to avoid deception of the buying public, and at the same time to retain the good will it had, during years, built up for the Dr. Price brand. Some of these new-labeled cans of the phosphate powder were sent into Arkansas. Under the statutes of that state against misbranding of foodstuffs, the state commissioner of mines, manufactures, and agriculture is empowered to issue a certificate to the effect that an article of food is misbranded, and upon receipt of such certificate by any prosecuting attorney of the state it is his duty to institute criminal proceedings against persons selling or offering to sell such misbranded articles. Such a certificate was issued by the commissioner in regard to the above new phosphate powders made by appellant. This bill was filed against Emerson, as a prosecuting attorney and as representative of all prosecuting attorneys, to enjoin such prosecution. Upon final hearing, the court found that the certificate issued by the commissioner had been erroneously issued, because not based upon substantial evidence at the hearing before him, as required by the state statute. It, therefore, granted a permanent injunction against prosecutions based upon that particular certificate. The court, however, refused to enjoin Emerson and other prosecuting attorneys from beginning and pursuing prosecutions for misbranding "on their own initiative under the general laws of the state." From this latter portion of the decree this appeal is brought.

[1] The jurisdiction of the court is contested by appellee, upon the grounds that the jurisdictional amount is absent and that this is an attempt to enjoin a criminal prosecution. The jurisdictional amount is alleged to be the value of the good will in the long-established brand of powder made and sold by appellant. The value of this good will is not questioned, but appellee contends that its present use is a fraud prohibited by statute, and that there can be no property right or value in an unlawful brand. Of course, no right to defraud can be recognized by courts as having any claim to legally exist or be protected, or as having any value. Here, however, the appellant has had for years a valuable good will in the brand of powder known as "Dr. Price's Cream Baking Powder," and it claims that the new label is lawful and enables it to

retain this good will, and that such valuable good will thus lawfully employed is threatened with destruction by the illegal acts of appellee. If these claims of appellant are true, it has a valuable property right which is imperiled. At least, that is the substantial basis of the action as revealed in the complaint, and therefore sufficiently establishes the jurisdiction against this objection.

[2] It is true that the general rule is that courts of equity will not enjoin criminal prosecutions. The exception is that where property rights are involved, and it is claimed seriously and in good faith that the act of the prosecutor is not authorized by law, equity can act. Hebe Co. v. Shaw, 248 U. S. 297, 39 Sup. Ct. 125, 63 L. Ed. 255; Greene v. Louisville, etc., R. R. Co., 244 U. S. 499, 506, 507, 37 Sup. Ct. 673, 61 L. Ed. 1280, Ann. Cas. 1917E, 88; Truax v. Raich, 239 U. S. 33, 37, 36 Sup. Ct. 7, 60 L. Ed. 131, L. R. A. 1916D, 545, Ann. Cas. 1917B, 283; Western Union Telegraph Co. v. Andrews, 216 U. S. 165, 30 Sup. Ct. 286, 54 L. Ed. 430; Ex parte Young, 209 U. S. 123, 28 Sup. Ct. 441, 52 L. Ed. 714, 13 L. R. A. (N. S.) 932, 14 Ann. Cas. 764. This lack of legal authority may arise because the act is within an invalid statute, or because it is not authorized by a valid statute. In either case the act is without legal sanction, is not protected by the official status of the prosecutor, and can be restrained. The complaint alleges a multiplicity of threatened prosecutions, and irreparable injury thereby through destruction of a valuable good will in an established trade brand; that such prosecutions are arbitrary, capricious, and unreasonable, and therefore not within nor authorized by the state statutes, but violative of appellant's rights, under Amendment 14, § 8, of article 1, and article 6 of the national Constitution. These contentions are apparently urged seriously and in good faith. They support the jurisdiction of the court.

The contentions made by appellant are, first, that the Arkansas statute as to misbranding does not include baking powders; second, that if such statutes do include baking powders, the only penalty provided for the sale of such as are imported into the state is a seizure of such powders through a proceeding in rem; third, that the label involved complies with the national Food and Drugs Act, and shipment of powders so branded cannot be interfered with prior to "the first sale of said packages in Arkansas"; fourth, that certain evidence was erroneously admitted and considered by the trial court; fifth, that upon the entire evidence the conclusion should be that the new label was not a misbranding.

[3] The basis of the claim that baking powder is not within the state misbranding statute are that such powder is not within the statutory term "article of food," and that the circumstances of the enactment of the statute prove that the Legislature did not intend baking powders to be included in such term, even if that term were in itself sufficient to include them. The contention as to the first ground is that baking powder is not eaten or taken into the body, but that it is merely an agency for "raising" the bread through the release of carbonic acid gas by chemical action, produced when moisture and heat in the bread dough act upon the powder. This seems an artificial view, when the fact, admitted in the record, is considered that the appellant has for

years carried on an extensive advertising campaign based on the claim that cream of tartar powders were healthful, while alum and phosphate powders were deleterious to health. The statute covers "any article of food," and was designed to protect the public from adulteration and deception. The term "any article of food" is sufficiently broad to cover any article ordinarily eaten or drunk, whether it be so used alone, or as a part of some mixture or compound which is eaten or drunk. Neither baking powder nor flour is eaten as such, but both are intended as components of bread. The purpose of the statute requires that this broad meaning be given the above term, unless the statute is to be materially crippled in its intended effect. The legal history of a similar English statute (St. 38 & 39 Vict. c. 63) as construed in James v. Jones, [1894] 1 Q. B. 304, is not persuasive in the presence of the obvious purpose of the Arkansas statute.

But it is claimed that, even though the term "any article of food" might be construed to include baking powders, yet the circumstances of enactment of this statute reveal that such construction was not intended by the Legislature. This contention is based on the claim that this statute was closely modeled after the national Food and Drug Act of June 30, 1906 (34 Stat. 769 [Comp. St. §§ 8717–8728]); that the national act (section 8), which defined misbranding, was, by its terms, made applicable "to all drugs, or articles of food, *or articles which enter into the composition of food*"; that baking powders were brought within the act only by the above italicized language; that this language is omitted from the Arkansas statute; that therefore the Legislature intended to omit such articles from the state statute. The national, as the state, act is aimed at adulteration, and also misbranding. The only language therein which could make baking powders subject to the adulteration provisions of the national act is "any article of food which is adulterated or misbranded," in section 1, and "the term 'food,' as used herein, shall include all articles used for food, drink, confectionery, or condiment by man or other animals, whether simple, mixed, or compound," in section 6.

The argument of appellant is that this language does not include such powders under the adulteration provisions of the act, because in the misbranding portions (section 8) it declares that misbranding shall apply "to all  *  *  *  articles of food, or articles which enter into the composition of food." We have neither been cited nor have we found any adjudication of this exact point in any contested case. The nearest approach is Hipolite Egg Co. v. United States, 220 U. S. 45, 31 Sup. Ct. 364, 55 L. Ed. 364, where the charge was that preserved eggs were adulterated. One point urged in that case (220 U. S. 52, 31 Sup. Ct. 365, 55 L. Ed. 364), was that the act did not apply—

"to an article of food which has not been shipped for sale, but which has been shipped solely for use as raw material in the manufacture of some other product."

The gist of that contention was that the shipment was not for sale, and no particular emphasis was placed on the character of the product. However, the court held the preserved eggs to be within the provision

against adulteration. Such eggs are not of themselves food, or fit for or intended to be used alone as food, but are designed for use with flour and other articles in making cakes. There is a guide, persuasive, though not governing, in the action of the administrative officers who have for more than a decade been charged with the enforcement of this law. In 1906, the year the law was enacted, the Secretary of Agriculture received a letter of inquiry as follows:

"We import a preparation of gelatin preserved with sulphurous acid for the purpose of fining wine. This gelatin is not used as a food and does not remain in the wine, although a small amount of the sulphurous acid may be left in the wine. Please inform us if the sale of this product is a violation of the food law."

The ruling thereon of the Secretary (Food Insp. Dec. No. 48) was:

"It is held that the products commonly added to foods in their preparation are properly classed as foods and come within the scope of the food and drugs act. * * * Pending a decision on the wholesomeness of sulphurous acid as provided in regulation 15 (b), its presence should be declared."

Regulation 15 governed "wholesomeness of colors and preservatives." Since then the department has repeatedly prosecuted the adulteration of such articles as gelatin, flour, tomato pulp, and tomato purée. None of these articles is fit for food as such, but all are intended to be used as components of food. The department has also adopted a definition and standard for baking powders. F. I. D. No. 174. So far as we are advised, this is the first attempt to contend that the above sections of the national law do not cover adulteration of all articles commonly entering into food composition. The above sections are copied into the Arkansas statute. If the omission in the Arkansas statute of the portion of section 8, above italicized, has any influence upon the construction of that statute, it is to emphasize that adulteration and misbranding are upon an equal footing so far as articles included, and that both cover all articles commonly entering into food.

[4] The second contention is that the only penalty under the state statute is forfeiture in an in rem proceeding, and that therefore prosecutions for sales are without the legal authority of the state officials. It is claimed that the personal penalties apply only to the manufacture within the state. This contention is based upon section 1 of the act, which penalizes the "manufacture within the state of any article of food or drug which is adulterated or misbranded within the meaning of this act. * * *" Kirby & Castle's Digest, § 6369; Acts Ark. 1907, p. 1156. If this were the only pertinent portion of the statute there would be much in appellant's claim. But section 6 of the act provides for the sale of adulterated or misbranded articles, and section 7 provides that—

"No dealer shall be prosecuted under the provisions of this act when he can establish a guaranty signed by the wholesaler, jobber, manufacturer, or other party residing in this state, from whom he purchased such articles. * * *"

The title of the act, to which we may refer for construction purposes (36 Cyc. 1133, note 91), is:

"An act preventing the manufacture or sale of adulterated or misbranded or poisonous or deleterious foods, drugs, medicines and liquors and for other purposes."

[5] Appellant's third contention, which is that the new label complies with the national act and therefore shipment of powders so branded cannot be interfered with prior to "the first sale of said packages in Arkansas," is not in the case, for there is no showing that any attempt has been or will be made to apply the statute to imported original packages. It may be added that, where the state law is not in conflict with the national act, a broad latitude is allowed states in protecting their citizens from adulterated or misbranded articles. Hebe Co. v. Shaw, 248 U. S. 297, 39 Sup. Ct. 125, 63 L. Ed. 255; Corn Products Co. v. Eddy, 249 U. S. 427, 39 Sup. Ct. 325, 63 L. Ed. 689.

[6] The fourth contention is that certain evidence was erroneously admitted and considered by the trial court in reaching the conclusion that the new label was misleading. The challenged testimony may be classified as follows: Statements by grocers and others that they believed buyers would be deceived into thinking that they were buying the cream of tartar powder formerly sold under this brand; advertisements, claimed to be deceptive, issued by appellant concerning the new powder; advertisements issued by appellant prior to the change commending cream of tartar as an ingredient, and condemning phosphate and alum as ingredients. As we may examine the entire evidence which we deem pertinent, disregarding such as seems to us immaterial, and determine the issue of fact de novo, no harm can result in this court from the admission of evidence in the trial court.

[7] The final and crucial question is whether the new label on the new phosphate powder is deceptive. Appellant contends that the new label accurately and truthfully states the facts, and all of the facts; that no one, reading the label, could possibly be deceived; that a change of ingredients may be properly made and the brand name preserved, provided the label, after the change, truthfully states the ingredients; that it cannot be held responsible for deception of such purchasers as do not take the trouble to notice the plain statements on the label. The broad purpose of the Arkansas statute is to prevent deception through a label or brand. The deception must be of the average buyer of the product. Ansehl v. Williams, 267 Fed. 9, this court, filed July 15, 1920. To ascertain whether a given label would act deceptively, the attitude of the average buyer toward that product at the period the label is put out may be examined. In no other way can there be proper determination of the probable effect upon him of the label. In most instances there is no definite nor particular information as to this attitude, and therefore the average buyer, in such instances, is treated as a person of average intelligence, exercising ordinary care in ascertaining what he is purchasing. In such cases he is charged with knowledge of what the label fairly tells him. The question there gets down to the statements upon the label itself. If they are, in words, form, and arrangement, such as to fairly apprise the average buyer of the truth as to the product, they are sufficient.

[8] There are instances, however, where it can be said with fair accuracy that the average buyer has certain things in mind when he purchases a certain product. In such cases this attitude of mind is one of the circumstances bearing upon the effect of the label. Another such

circumstance is the familiarity of the average buyer with the product and the label. When a certain symbol, name, mark, or label has become established in the public mind and confidence as having a certain definite quality, composition, or integrity, it is obvious that the average buyer relies thereon and ceases naturally to scrutinize the purchased package as he would in the absence of such experience. In the present case appellant and its trade predecessors have built up a large trade and a valuable good will in the public mind in "Dr. Price's Cream Baking Powder." The brand has become established in public esteem during more than 60 years. Baking powders have long been articles of wide general consumption. What has served to establish this particular brand in public favor, and what does the buying public think it is getting when it purchases "Dr. Price's Cream Baking Powder"? The excellency of a baking powder depends partially upon the skill used in manufacture and partially upon the ingredients. This record reveals that appellant has employed commendable skill in the manufacture of its product; but there is no serious basis in the evidence for a contention that this skill is superior to competitors, or, at least, so superior as to constitute the reason for the high esteem in which the buying public has long held this brand. The record is convincing that the governing inducement in the public mind was the particular acid ingredient used by appellant. The reasons for this conclusion will be later revealed in this opinion.

[10] Baking powder is a mixture, in dry form, of certain alkali and acid substances combined with a "filler." When moistened and heated, as in baking dough, a chemical reaction occurs between the acid and alkali agents, which liberates carbonic gas. This gas is the agency which "raises" or leavens bread. The "filler" is nearly always of cornstarch, and performs the passive office of preserving the acid and alkali agents inactive until release is desired. The alkali agent is usually bicarbonate of soda. The acid agent differs, and thus gives character, name, and classification to the powder. This agent is tartrate (cream of tartar or tartaric acid), phosphate, or alum. Powders are therefore classified and known generally as "cream of tartar," "phosphate," or "alum" powders. This classification is not merely technical, but is known to the purchasing public. Cream of tartar and tartaric acid are vegetable in origin, being derived from grapes; phosphates are derived from bones and certain rocks; alum is a mineral derivative. Tartrates are more expensive than either of the others. Tartrates are wholesome in food. Although by no means unchallenged, there has long existed a well-defined opinion among scientific and medical authorities that phosphates were undesirable, and that alum was unwholesome for food usage. An active competitive warfare between baking powder manufacturers has been maintained for many years. This warfare has not so much taken the form of competition between particular manufacturers on the basis of special excellence in process of manufacture, but has been almost entirely along lines of the acid ingredient used, and has been based upon the wholesomeness or unwholesomeness of that ingredient.

Appellant has, for years, sought patronage for its necessarily higher priced tartrate powder, upon the claim that tartrates were wholesome,

while phosphate was undesirable, and alum positively injurious. Manufacturers of phosphate and of alum powders have met this challenge. The result has been an extended and widespread campaign of education of the buying public along these lines. A number of advertisements of various sorts, distributed in Arkansas by appellant, convince that the "feature" held out to the buying public why this brand should be preferred, has been that it was a pure tartrate powder. When we consider that this powder was appreciably higher priced than phosphate or alum powders, and that either of those powders would release carbonic acid gas and leaven dough, we cannot escape the conclusion that appellant has been successful in its campaign of public education, and that the moving inducement in the mind of that portion of the public which patronized this brand and created the valuable good will therein, has been that tartrates were more desirable for food than phosphate or alum. We cannot doubt that the bulk of this good will rests upon the presence of tartrates, and the absence of phosphate or alum in this powder. The purchasers who created and maintain that good will expect, and have been educated by appellant to expect, a tartrate powder when they buy this brand. The attitude, therefore, of the buying public who bought this brand, prior and up to September, 1919, and so far as shown, until the institution of this proceeding, was that when they purchased it they secured a healthy, efficient tartrate powder.

In September, 1919, appellant changed this acid ingredient to phosphate, no longer using any tartrates therein. The claim is made that recent more searching analyses and experiments have proven that phosphate is not unwholesome nor undesirable for food usages. So far as this record shows, the new phosphate powder is as wholesome and as efficacious as the former tartrate powder, and possesses the added virtue of costing the public about one half. Misbranding, however, does not rest upon unwholesomeness nor adulteration. It rests upon deception of the buyer. That deception consists in inducing him to purchase, under a given mark, brand, or label, an article which is different from that which he intends to buy, and which he has a right reasonably to suppose he is getting under that mark, brand, or label. The old powder was to disappear, with the result that its users would buy some other powder. Appellant, naturally and properly, desired to secure that patronage for the new product. It might reasonably expect that a portion, at least, of that patronage, relying upon experience of the excellence of the former powder, might prefer to buy the new powder made by it to a similar powder made by others. It had a right to inform its patrons that the source of the old and new powders was the same. This it could do in any proper and effective method, but it must do it in such a way that the average buyer would acquire the information of the change, so that he could act with that information.

We are here concerned with the label. The question is, therefore, whether, having in mind the attitude of the buying public toward the old label used on the cream of tartar powder, the new label used on the phosphate powder would probably and naturally deceive the average buyer of the new package into believing that he was getting the old cream of tartar powder. The old and new labels are as here set out.

As here reproduced, red is shown by diagonal shading; yellow is shown white; black is as in original label. The medallion colors are fully described in the opinion.

# PRICE'S "CREAM" BAKING POWDER
### REG. U. S. PAT. OFF.

## Does not contain Alum or Ammonia

**DIRECTIONS.**—Keep the Powder in a dry place. Do not put a wet spoon in it.

Mix the Baking Powder with the flour thoroughly by sifting together two or three times.

For making Biscuits, Cakes, Muffins, Graham Gems, Doughnuts, Waffles, Pie Crust, Gingerbread, Wheat and Buckwheat Cakes, or any article of food desired to be retained, use two teaspoons of the Powder to each quart of flour. Make the Dough soft with sweet milk or water. Do not knead. Do not use Saleratus, Soda, Sour Milk, or any substitute for this Powder. When a recipe calls for one teaspoon of Soda and two teaspoons of Cream of Tartar, use two teaspoons of Dr. Price's Baking Powder.

**BISCUIT.**—Sift together 4 cups flour, 2 rounded teaspoons Dr. Price's Baking Powder and ½ teaspoon salt. Rub in 2 tablespoons shortening. Mix to a soft dough with cold milk or water. Roll out on floured board; cut with round cutter to desired size and bake in hot oven about 15 minutes.

**PLAIN CAKE.**—Cream ½ cup shortening with one cup sugar. Add well beaten yolks of 2 eggs and ½ cup milk. Mix well. Sift 2 cups flour with 2 teaspoons Dr. Price's Baking Powder and ½ teaspoon salt, and add half, beating thoroughly. Add one-half the beaten whites of 2 eggs, the remainder of flour, then other half of egg whites, mixing after each addition. Add flavoring and bake in greased loaf pan in moderate oven 35 to 45 minutes.

### SOLD ONLY IN CANS

THIS BAKING POWDER IS COMPOSED OF THE FOLLOWING INGREDIENTS AND NONE OTHER: BICARBONATE OF SODA, PHOSPHATE AND CORN STARCH.

All grocers are authorized to guarantee in every respect to customers

## PRICE'S "CREAM" BAKING POWDER
### REG. U. S. PAT. OFF.

**MANUFACTURED BY**

## ROYAL BAKING POWDER CO. OF N. J.

OFFICES: CHICAGO AND NEW YORK

As here reproduced, red is shown as diagonal shading; yellow is shown white; black is as in original label.

These labels are pasted entirely around cans containing certain weights of powder.

If there had never been a former label, the new label would be well-nigh unobjectionable. Considering the new label, alone and apart, it states with fair truthfulness and completeness all that need be upon such a label. The word "cream" might be objectionable, as suggestive of cream of tartar, in view of the education of the public as to this ingredient. There can be no doubt, however, that any one who should read the label with any care would be informed truthfully as to the origin and acid ingredient. But we cannot disregard the earlier label. The nub of the claimed deception is, not that the new label alone and of itself is such that it would deceive a purchaser who had never before heard of "Dr. Price's Cream Baking Powder," but it is that it would, by its general similarity, deceive a large patronage long familiar with the old label. It should be added that this very patronage constitutes the good will which appellant is seeking to protect and preserve. A comparison of the two labels is therefore necessary. While an inspection of the above pictures will be sufficient to support the conclusions reached, a few observations will be helpful. Because of the greater bulk, as compared to weight, of cream of tartar over phosphate, the phosphate cans were made with a slightly raised bottom. In outside size and shape the two cans are identical. The coloring of the labels, which is black, red, and yellow, is identical. The location and size of type is identical. The differences are: Omission from the new label of the medallion (which was separately pasted on the old label, and was blue in background, with white lettering and dull gold border wreath); substitution of a bunch of golden rod for the grapes formerly held in the cornucopia design; and change in certain portions of the legend relating to the acid ingredient. The general appearance of the two labels is strikingly similar. Even if placed side by side on a grocery shelf, a few feet removed from the customer, the similarity would be evident. The probability of the customer mistaking the new for the old is increased, if only the new be displayed, for then all standards of casual comparison and contrast vanish. Buyers, who have become customers of a brand, no longer give it more than the most general inspection. They become familiar with its general appearance, and having confidence in it and what it represents, they do not expect and therefore do not look for essential change either in the article or in the label. This is the attitude of the average buyer of any product or article of established reputation.

[9] If the manufacturer makes a change in the article and that change be of a character which would, considering all of the attendant circumstances, naturally affect the attitude of the purchasers of that article, fair dealing and the law require that such purchasers be effectively informed of that change. Here the acid ingredient of the baking powder was a material consideration in the mind of the purchasing public. For years that public had been educated by appellant to prefer this brand because it contained cream of tartar, and did not contain either phosphate or alum. That public had been taught to expect cream of tartar and an absence of phosphate or alum when it

purchased this brand. The label has been long employed and has become familiar to the public. Obviously, a complete change from cream of tartar to phosphate would be an important difference in the minds of the patrons of this brand. Therefore any label on the new powder must be so different from the old label, in appearance and prominent legend, that the usual buyer, familiar with the old brand and ignorant of any change, would have his attention arrested and be prompted to suspect, if not to know, that the powders were not the same, and thus be led to investigate the label. We think the present label fails in this requirement, and constitutes a misbrand, which would probably and naturally deceive the average purchasers of the former powder. It is suggested that the difference in price would excite inquiry and investigation. The advertisements in any daily paper reveal such wide and apparently unreasonable differences and reductions in prices of all character of articles that quality has largely weakened as a basis for price in the public mind. There are other reasons, unassociated with quality, which influence change in price.

The decree of the trial court is affirmed.