AUSTIN *v.* ONNES.

5-647                                         278 S. W. 2d 93

Opinion delivered April 25, 1955.

*Tom Gentry,* Attorney General, and *Ben J. Harrison,* Asst. Atty. General, for appellant.

*Mehaffy, Smith & Williams* and *B. S. Clark,* for appellee.

ED. F. McFADDIN, Justice. The question posed on this appeal is whether the sale, to stores in this State, of "Buisman's Famous Dutch Flavoring" is a violation of Act 415 of 1953, known as the "Food, Drug and Cosmetic Act."[1]

---

[1] Since this is the first case before us involving this Act 415 of 1953, a statement of the historical background is apropos. Prior to

Appellee Onnes, a citizen of California, is engaged in the importation and sale, in Arkansas and other States, of a preparation called "Buisman's Famous Dutch Flavoring" (hereinafter sometimes called merely "Buisman's"); and Jay Freeman, Inc., of Little Rock is the agent and local distributor of Buisman's. Appellant Austin is the Director of the Food and Drug Division of the Arkansas State Board of Health. In such capacity he directed Jay Freeman, Inc., to desist from selling or distributing Buisman's in the State of Arkansas since appellant was of the opinion that the product was adulterated and misbranded, and violated certain sections of Act 415 of 1953.

Thereupon appellee Onnes brought this suit against appellant Austin, both as an individual and in his capacity as aforesaid, to enjoin appellant from interfering with the sale and distribution of Buisman's; and Onnes alleged that Buisman's did not violate any of the provisions of the said Act 415.[2] The issue was joined as to

1907 our Statutes on food adulteration, etc., were contained in § 1701-9 of Kirby's Digest of 1904 as a part of the criminal law. Act 431 of 1907 was the first comprehensive food and drug act in this State, and that was the Act involved in the case of *Royal Baking Powder* v. *Emerson*, 270 Fed. 429, decided by the 8th Circuit Court of Appeals. Act 190 of 1939 amended the 1907 Act in many particulars; and then came Act 415 of 1953 here involved. The various Acts are codified in § 82-901 *et seq.*, Ark. Stats. (and § 82-1101 Cumulative Pocket Parts). Of course, most food and drug acts are in many respects patterned from the Federal law as found in U. S. Code Anno., Title 21. Our study does not disclose any model from which our Act 415 of 1953 was copied. The only similar Act we have found is the Oklahoma Act (House Bill No. 1054) approved June 4, 1953, and found in the Oklahoma Sessions Laws of 1953 at page 297. (See Okla. Stats. Anno., Title 63, § 180 *et seq.*) It is a reasonable presumption that there was some collaboration between the proponents of the Arkansas Act No. 415 and said Oklahoma Act.

[2] Procedural matters not urged by the parties are not considered on this appeal and therefore not foreclosed by this decision. Also there were some allegations in the complaint and some evidence offered to the effect that the appellant, Austin, had told the Director of the State Hospital for Nervous Diseases that Buisman's should not be used at that institution. We entirely eliminate all such allegations and evidence from this decision. The question is not briefed as to the right of a resident of California to bring a suit on how much can be saved by a State institution in Arkansas; neither is the question briefed as to the right of a resident of California to question the power of one State official to give advice or information to another State official in Arkansas, either under § 21 (b) of Act 415 or under any other provision of law. Therefore we forego any discussion of such matters in this decision.

whether Buisman's was either adulterated *or* misbranded in violation of any provision of the said Act 415.

The evidence showed that Buisman's was a product composed of caramelized starch and calcium phosphate and was sold through grocery stores as a product to be used in the preparation of liquid coffee. Witnesses for Buisman's testified that the using of one tablespoon of Buisman's to one pound of any kind of coffee would allow the use of twice as much water in making the liquid coffee to be served. The Buisman's circulars say:

"Buisman's Famous Dutch Flavoring (imported from Holland) guarantees the uniform excellence of every cup. . . . One tablespoonful of Buisman's Famous Dutch Flavoring with one pound of coffee—your favorite brand. . . . Put the whole pound of ground coffee into an empty two-pound can, add one rounded tablespoonful of Buisman's Famous Dutch Flavoring, . . . Shake the can vigorously so the Buisman's Famous Dutch Flavoring thoroughly blends with your coffee. Make coffee as you have always made it with one important difference! Now use only one tablespoon of coffee blend for every two cups of brewed coffee desired. That's right—use only half as much of this blend for a better more flavorful cup of coffee. . . . Every tablespoon of blend coffee makes two cups of the most delicious coffee you ever tasted when you use Buisman's Flavoring to bring out all the good flavor in the coffee."

It was shown that the ingredients of Buisman's Famous Dutch Flavoring (caramelized starch and calcium phosphate) are not harmful or deleterious to human consumption in the quantities suggested for the completed cup of liquid coffee; but it was and is strenuously insisted by appellant that the use of Buisman's made a concoction different from usual liquid coffee that is served in the cup. The Trial Court found that the sale of Buisman's in Arkansas was legal; and therefore enjoined appellant from forbidding the sale of the product. This appeal questions the Chancery decree.

The appellant insists that Buisman's is an adulteration and also a misbranding. As to adulteration appellant claims, *inter alia,* that the sale of Buisman's is in violation of that portion of § 10 of the Act 415 which reads:

"A food shall be deemed to be adulterated: . . . (b) (4) if any substance has been added thereto or mixed or packed therewith so as to increase its bulk or weight, or reduce its quality or strength or make it appear better or of greater value than it is."

Appellant also contends that Buisman's is misbranded and in violation of § 11 of Act 415, the pertinent portions of which read:

"A food shall be deemed to be misbranded: . . . (1) if it is a product intended as an ingredient of another food and when used according to directions of the purveyor will result in the final food product being adulterated or misbranded. . . ."

To assist his contentions appellant cites us to the following cases: *U. S.* v. *2 Bags, etc.,* 147 Fed. 2d 123; *U. S.* v. *36 Drums, etc.,* 164 Fed. 2d 250; *U. S.* v. *716 Cases, etc.,* 179 Fed. 2d 174; *U. S.* v. *10 Cases, etc.,* 49 Fed. 2d 87; *U. S.* v. *88 Cases, etc.,* 187 Fed. 2d 967; *U. S.* v. *651 Cases, etc.,* 114 Fed. Supp. 430; *Royal Bak. Pow.* v. *Emerson,* 270 Fed. 429.

The weakness in appellant's contention is in the fact that there is neither a standard nor a definition for what is to be contained in the liquid composing a cup of coffee. The most recently published revision of the Rules and Regulations of the Arkansas State Board of Health was issued in 1952; and it has nothing covering the point at issue. Section 19 of Act 415 is the general section allowing promulgation of regulations; but no new regulations have yet been issued under the Act 415. Section 9 of the Act 415 gives the State Board of Health the power to ". . . promulgate regulations fixing and establishing for any food or class of food a reasonable definition and standard of identity, and/or reasonable

standard of quality and/or of container. In prescribing
a definition and standard of identity for any food or
class of food in which optional ingredients are permit-
ted, the Board of Health shall, for the purpose of pro-
moting honesty and fair dealing in the interest of con-
sumers, designate the optional ingredients which shall
be named on the label. . . .'' But we know judicially[3]
that the State Board of Health has not issued any defi-
nition or standard of identity for the liquid in a cup of
coffee.

*Meyer* v. *State,* 218 Ark. 440, 236 S. W. 2d 996, was
a case involving food adulteration; and we resorted to
the dictionary definition for ''bologna,'' ''weiner,''
''frankfurter'' and ''hamburger.'' But we cannot resort
to the dictionary definition of *coffee as a liquid served
in a cup,* because the dictionaries contain a variety of
such definitions. Webster's Unabridged Dictionary, 2nd
Ed., published in 1951, says, *inter alia,* of coffee:

''(1) A drink made by infusion or decoction from
the roasted and ground or pounded seeds of *Coffea.*
. . . . (4) A drink or substance used as a substitute
for coffee.''

So the dictionary recognizes a *substitute* at the same
time that it recognizes that the liquid is from the *roasted
seeds* of ''*Coffea.*'' Then, as to the ''seeds of *Coffea,*''
the dictionary gives us a variety:

''*Mocha* denotes a superior coffee grown in the
Yemen District in Arabia; *Java,* a superior coffee grown
on the Island of Java; *Sumatra,* sometimes called Su-
matra Java, a coffee similar to Java, grown on the Island
of Sumatra. *Brazils,* chief of which are *Santos* and *Rio*
coffees, comprise considerably over half of the world's
supply. *Milds* are coffees grown in other South Amer-
ican countries. . . . Among these are *Maracaibo*

---

[3] This Court takes judicial notice of the Rules and Regulations
duly issued and promulgated by the State Board of Health. See *Seu-
bold* v. *Ft. Smith Special School Dist.,* 218 Ark. 560, 237 S. W. 2d 884;
and cases there cited.

from Venezuela, and *Bogota* and *Medillin* from Colombia. *Retail brands are usually blends."*

It was shown in the evidence in this case that some canned coffees (*i. e.,* "French Market" and "French Drip") always contain chicory; while other canned or packaged coffees contain other added ingredients. In short, neither the dictionary nor common usage afford us any definition or standard as to what is supposed to be contained in the liquid coffee served in the cup. Furthermore the strength of the liquid coffee served in the cup varies greatly as to individual tastes.

In the light of all these variables, and until the State Board of Health issues regulations fixing and establishing a reasonable definition and standard of identity for the liquid coffee served in the cup, it is not fair to say that Buisman's—a harmless ingredient—cannot be sold as a separate product[4] to be added by the purchaser, if so desired, to make the liquid coffee. All liquid coffee is an adulteration of water in one sense of the word, and the adding of Buisman's—if known—is no more an adulteration of water than the ground coffee is itself an adulteration of water.

Until such time as the State Board of Health, acting under § 9 of the Act 415, duly issues regulations[5] fixing and establishing a standard of identity and quality for the liquid contained in a cup of coffee as sold in this State, we cannot say that the adding of Buisman's is an adulteration; and likewise we cannot say that Buisman's is misbranded because the label states exactly what it is and there is no law that fixes the standard of the product to which it is added.

Therefore the injunction issued by the Trial Court against appellant is affirmed, insofar as restrains and enjoins the appellant from notifying any distributor

---

[4] It was shown that the Federal Food and Drug officials had not prohibited the sale of Buisman's in interstate commerce.

[5] Such rules and regulations issued under § 9 of Act 415, touching the content of a liquid cup of coffee, might be questioned. That issue is not before us at the present time.

against the sale and distribution of Buisman's to *stores* in Arkansas. As so modified and limited the injunction issued by the Chancery Court is affirmed.

The Chief Justice dissents from the affirmance.