## TRINITY METHODIST CHURCH, SOUTH, v. FEDERAL RADIO COMMISSION (LYON, Intervener).

### No. 5561.

Court of Appeals of the District of Columbia.
Argued May 3 and 4, 1932.
Decided Nov. 28, 1932.

Rehearing Denied Dec. 2, 1932.

Louis G. Caldwell and Arthur W. Scharfeld, both of Washington, D. C., for appellant.

Thad H. Brown, D. M. Patrick, and Fanney Neyman, all of Washington, D. C., for appellee.

Thomas P. Littlepage, John M. Littlepage, and Paul D. P. Spearman, all of Washington, D. C., for intervener.

Before MARTIN, Chief Justice, and ROBB, VAN ORSDEL, HITZ, and GRONER, Associate Justices.

GRONER, Associate Justice.

Appellant, Trinity Methodist Church, South, was the lessee and operator of a radio-broadcasting station at Los Angeles, Cal., known by the call letters KGEF. The station had been in operation for several years. The Commission, in its findings, shows that, though in the name of the church, the station was in fact owned by the Reverend Doctor Shuler and its operation dominated by him. Dr. Shuler is the minister in charge of Trinity Church. The station was operated for a total of 23¼ hours each week.

In September, 1930, appellant filed an application for renewal of station license. Numerous citizens of Los Angeles protested, and the Commission, being unable to determine

that public interest, convenience, and necessity would be served, set the application down for hearing before an examiner. In January, 1931, the matter was heard, and the testimony of ninety witnesses taken. The examiner recommended renewal of the license. Exceptions were filed by one of the objectors, and oral argument requested. This was had before the Commission, sitting in banc, and, upon consideration of the evidence, the examiner's report, the exceptions, etc., the Commission denied the application for renewal upon the ground that the public interest, convenience, and/or necessity would not be served by the granting of the application. Some of the things urging it to this conclusion were that the station had been used to attack a religious organization, meaning the Roman Catholic Church; that the broadcasts by Dr. Shuler were sensational rather than instructive; and that in two instances Shuler had been convicted of attempting in his radio talks to obstruct the orderly administration of public justice.

This court denied a motion for a stay order, and this appeal was taken. The basis of the appeal is that the Commission's decision is unconstitutional, in that it violates the guaranty of free speech, and also that it deprives appellant of his property without due process of law. It is further insisted that the decision violates the Radio Act because not supported by substantial evidence, and therefore is arbitrary and capricious.

We have been at great pains to examine carefully the record of a thousand pages, and have reached the conclusion that none of these assignments is well taken.

■■■ We need not stop to review the cases construing the depth and breadth of the first amendment. The subject in its more general outlook has been the source of much writing since Milton's Areopagitica, the emancipation of the English press by the withdrawal of the licensing act in the reign of William the Third, and the Letters of Junius. It is enough now to say that the universal trend of decisions has recognized the guaranty of the amendment to prevent previous restraints upon publications, as well as immunity of censorship, leaving to correction by subsequent punishment those utterances or publications contrary to the public welfare. In this aspect it is generally regarded that freedom of speech and press cannot be infringed by legislative, executive, or judicial action, and that the constitutional guaranty should be given liberal and comprehensive construction. It may therefore be set down as a fundamental principle that un-der these constitutional guaranties the citizen has in the first instance the right to utter or publish his sentiments, though, of course, upon condition that he is responsible for any abuse of that right. Near v. Minnesota ex rel. Olson, 283 U. S. 697, 51 S. Ct. 625, 75 L. Ed. 1357. "Every freeman has an undoubted right to lay what sentiments he pleases before the public; to forbid this is to destroy the freedom of the press; but if he publishes what is improper, mischievous, or illegal, he must take the consequences of his own temerity." 4th Bl. Com. 151, 152. But this does not mean that the government, through agencies established by Congress, may not refuse a renewal of license to one who has abused it to broadcast defamatory and untrue matter. In that case there is not a denial of the freedom of speech, but merely the application of the regulatory power of Congress in a field within the scope of its legislative authority. See KFKB Broadcasting Ass'n v. Federal Radio Commission, 60 App. D. C. 79, 47 F.(2d) 670.

Section 1 of the Radio Act of 1927 (44 Stat. 1162, title 47, USCA, § 81) specifically declares the purpose of the act to be to regulate all forms of interstate and foreign radio transmissions and communications within the United States, its territories and possessions; to maintain the control of the United States over all the channels of interstate and foreign radio transmissions; and to provide for the use of such channels for limited periods of time, under licenses granted by federal authority. The federal authority set up by the act to carry out its terms is the Federal Radio Commission, and the Commission is given power, and required, upon examination of an application for a station license, or for a renewal or modification, to determine whether "public interest, convenience, or necessity" will be served by the granting thereof, and any applicant for a renewal of license whose application is refused may of right appeal from such decision to this court.

■ We have already held that radio communication, in the sense contemplated by the act, constituted interstate commerce, KFKB Broadcasting Ass'n v. Federal Radio Commission, supra; General Elec. Co. v. Federal Radio Commission, 58 App. D. C. 386, 31 F.(2d) 630, and in this respect we are supported by many decisions of the Supreme Court, Pensacola Telegraph Co. v. Western Union Tel. Co., 96 U. S. 1, 9, 24 L. Ed. 708; International Text-Book Co. v. Pigg, 217 U. S. 91, 106, 107, 30 S. Ct. 481, 54 L. Ed. 678, 27 L. R. A. (N. S.) 493, 18 Ann. Cas. 1103; Western Union Teleg. Co. v. Pendleton, 122

U. S. 347, 356, 7 S. Ct. 1126, 30 L. Ed. 1187. And we do not understand it is contended that where, as in the case before us, there is no physical substance between the transmitting and the receiving apparatus, the broadcasting of programs across state lines is not interstate commerce, and, if this be true, it is equally true that the power of Congress to regulate interstate commerce, complete in itself, may be exercised to its utmost extent, and acknowledges no limitation, other than such as prescribed in the Constitution (Gibbons v. Ogden, 9 Wheat. 1, 6 L. Ed. 23), and these powers, as was said by the Supreme Court in Pensacola Tel. Co. v. Western Union Tel. Co., supra, "keep pace with the progress of the country, and adapt themselves to the new developments of time and circumstances."

▮ In recent years the power under the commerce clause has been extended to legislation against interstate commerce in stolen automobiles, Brooks v. United States, 267 U. S. 432, 45 S. Ct. 345, 69 L. Ed. 699, 37 A. L. R. 1407; to transportation of adulterated foods, Hipolite Egg Co. v. United States, 220 U. S. 45, 31 S. Ct. 364, 55 L. Ed. 364; in the suppression of interstate commerce for immoral purposes, Hoke v. United States, 227 U. S. 308, 33 S. Ct. 281, 57 L. Ed. 523, 43 L. R. A. (N. S.) 906, Ann. Cas. 1913E, 905; and in a variety of other subjects never contemplated by the framers of the Constitution. It is too late now to contend that Congress may not regulate, and, in some instances, deny, the facilities of interstate commerce to a business or occupation which it deems inimical to the public welfare or contrary to the public interest. Lottery Cases, 188 U. S. 321, 352, 23 S. Ct. 321, 47 L. Ed. 492. Everyone interested in radio legislation approved the principle of limiting the number of broadcasting stations, or, perhaps, it would be more nearly correct to say, recognized the inevitable necessity. In these circumstances Congress intervened and asserted its paramount authority, and, if it be admitted, as we think it must be, that, in the present condition of the science with its limited facilities, the regulatory provisions of the Radio Act are a reasonable exercise by Congress of its powers, the exercise of these powers is no more restricted by the First Amendment than are the police powers of the States under the Fourteenth Amendment. See In re Kemmler, 136 U. S. 436, 448, 449, 10 S. Ct. 930, 34 L. Ed. 519; Hamilton v. Kentucky, etc., Co., 251 U. S. 146, at page 156, 40 S. Ct. 106, 64 L. Ed. 194. In either case the answer depends upon whether the statute is a reasonable exercise of governmental control for the public good.

▮▮ In the case under consideration, the evidence abundantly sustains the conclusion of the Commission that the continuance of the broadcasting programs of appellant is not in the public interest. In a proceeding for contempt against Dr. Shuler, on appeal to the Supreme Court of California, that court said (In re Shuler, 210 Cal. 377, 292 P. 481, 492) that the broadcast utterances of Dr. Shuler disclosed throughout the determination on his part to impose on the trial courts his own will and views with respect to certain causes then pending or on trial, and amounted to contempt of court. Appellant, not satisfied with attacking the judges of the courts in cases then pending before them, attacked the bar association for its activities in recommending judges, charging it with ulterior and sinister purposes. With no more justification, he charged particular judges with sundry immoral acts. He made defamatory statements against the board of health. He charged that the labor temple in Los Angeles was a bootlegging and gambling joint. In none of these matters, when called on to explain or justify his statements, was he able to do more than declare that the statements expressed his own sentiments. On one occasion he announced over the radio that he had certain damaging information against a prominent unnamed man which, unless a contribution (presumably to the church) of a hundred dollars was forthcoming, he would disclose. As a result, he received contributions from several persons. He freely spoke of "pimps" and prostitutes. He alluded slightingly to the Jews as a race, and made frequent and bitter attacks on the Roman Catholic religion and its relations to government. However inspired Dr. Shuler may have been by what he regarded as patriotic zeal, however sincere in denouncing conditions he did not approve, it is manifest, we think, that it is not narrowing the ordinary conception of "public interest" in declaring his broadcasts—without facts to sustain or to justify them—not within that term, and, since that is the test the Commission is required to apply, we think it was its duty in considering the application for renewal to take notice of appellant's conduct in his previous use of the permit, and, in the circumstances, the refusal, we think, was neither arbitrary nor capricious.

If it be considered that one in possession of a permit to broadcast in interstate commerce may, without let or hindrance from any source, use these facilities, reaching out, as they do, from one corner of the country to

the other, to obstruct the administration of justice, offend the religious susceptibilities of thousands, inspire political distrust and civic discord, or offend youth and innocence by the free use of words suggestive of sexual immorality, and be answerable for slander only at the instance of the one offended, then this great science, instead of a boon, will become a scourge, and the nation a theater for the display of individual passions and the collision of personal interests. This is neither censorship nor previous restraint, nor is it a whittling away of the rights guaranteed by the First Amendment, or an impairment of their free exercise. Appellant may continue to indulge his strictures upon the characters of men in public office. He may just as freely as ever criticize religious practices of which he does not approve. He may even indulge private malice or personal slander—subject, of course, to be required to answer for the abuse thereof—but he may not, as we think, demand, of right, the continued use of an instrumentality of commerce for such purposes, or any other, except in subordination to all reasonable rules and regulations Congress, acting through the Commission, may prescribe.

 Nor are we any more impressed with the argument that the refusal to renew a license is a taking of property within the Fifth Amendment. There is a marked difference between the destruction of physical property, as in Pennsylvania Coal Co. v. Mahon, 260 U. S. 393, 43 S. Ct. 158, 67 L. Ed. 322, 28 A. L. R. 1321, and the denial of a permit to use the limited channels of the air. As was pointed out in American Bond & Mtg. Co. v. United States (C. C. A.) 52 F.(2d) 318, 320, the former is vested, the latter permissive, and, as was said by the Supreme Court in Chicago, B. & Q. R. Co. v. Illinois, 200 U. S. 561, 593, 26 S. Ct. 341, 350, 50 L. Ed. 596, 4 Ann. Cas. 1175: "If the injury complained of is only incidental to the legitimate exercise of governmental powers for the public good, then there is no taking of property for the public use, and a right to compensation, on account of such injury, does not attach under the Constitution." When Congress imposes restrictions in a field falling within the scope of its legislative authority and a taking of property without compensation is alleged, the test is whether the restrictive measures are reasonably adapted to secure the purposes and objects of regulation. If this test is satisfied, then "the enforcement of uncompensated obedience" to such regulation "is not an unconstitutional taking of property without compensation or

without due process of law." Atlantic Coast Line R. Co. v. Goldsboro, 232 U. S. 548, 558, 34 S. Ct. 364, 368, 58 L. Ed. 721.

A case which illustrates this principle is Greenleaf-Johnson Lumber Co. v. Garrison, 237 U. S. 251, 35 S. Ct. 551, 59 L. Ed. 939. In that case the state of Virginia had established lines of navigability in the harbor of Norfolk. The lumber company applied for and obtained permission from the state to build a wharf from its upland into the river to the line of navigability. Some twenty years later the government, in the exercise of its control of the navigable waters and in the interest of commerce and navigation, adopted the lines of navigability formerly established by the state of Virginia, but a few years prior to the commencement of the suit the Secretary of War, by authority conferred on him by the Congress, re-established the lines, as a result of which the riparian proprietor's wharf extended some two hundred feet within the new lines of navigability. The Secretary of War asserted the right to require the demolition of the wharf as an obstruction to navigation. The owner insisted that, having received a grant of privilege from the state of Virginia prior to the exercise by the government of its power over the river, and subsequently acquiesced in by its adoption of the state lines, the property right thus acquired became as stable as any other property, and the privilege so granted irrevocable, and that it could be taken for public use only upon the payment of just compensation. The contention was rejected on the principle that the control of Congress over the navigable streams of the country is conclusive, and its judgment and determination the exercise of a legislative power in respect of a subject wholly within its control. To the same effect is Gibson v. United States, 166 U. S. 269, 17 S. Ct. 578, 41 L. Ed. 996, in which a work of public improvement in the Ohio river diminished greatly the value of the riparian owner's property by destroying his access to navigable water; and Union Bridge Co. v. United States, 204 U. S. 364, 27 S. Ct. 367, 51 L. Ed. 523, where the owner of a bridge was required to remodel the same as an obstruction to navigation, though erected under authority of the state when it was not an obstruction to navigation; and Louisville Bridge Co. v. United States, 242 U. S. 409, 37 S. Ct. 158, 61 L. Ed. 395, in which the same rule was applied in the case of a bridge erected expressly pursuant to an act of Congress. So also in United States v. Chandler-Dunbar Water Power Co., 229 U. S. 53, 33 S. Ct. 667, 57 L. Ed. 1063, the right of the govern-

ment to destroy the water power of a riparian owner was upheld; and in Lewis Blue Point Oyster Cultivation Co. v. Briggs, 229 U. S. 82, 33 S. Ct. 679, 57 L. Ed. 1083, the right of compensation for the destruction of privately owned oyster beds was denied. All of these cases indubitably show adherence to the principle that one who applies for and obtains a grant or permit from a state, or the United States, to make use of a medium of interstate commerce, under the control and subject to the dominant power of the government, takes such grant or right subject to the exercise of the power of government, in the public interest, to withdraw it without compensation.

Appellant was duly notified by the Commission of the hearing which it ordered to be held to determine if the public interest, convenience, or necessity would be served by granting a renewal of its license. Due notice of this hearing was given and opportunity extended to furnish proof to establish the right under the provisions of the act for a renewal of the grant. There was, therefore, no lack of due process, and, considered from every point of view, the action of the Commission in refusing to renew was in all respects right, and should be, and is, affirmed.

Affirmed.

VAN ORSDEL, Associate Justice, concurs in the result.