# Authority of the Federal Communications Commission to Deny a Broadcast License to a Newspaper Owner

The Federal Communications Commission does not have authority under the Communications Act of 1934 to refuse to grant broadcasting licenses on the ground that the ownership of the proposed facilities is in, or in common with, a newspaper.

It is doubtful that Congress has the power to broaden the Act to provide the FCC with such authority.

Such a provision would not violate the First Amendment clauses protecting the freedom of speech and of the press, but it would probably be held arbitrary and violative of the Fifth Amendment.

January 6, 1937

THE PRESIDENT

   THE WHITE HOUSE

My Dear Mr. President:

   Referring to the inquiry as to whether the Federal Communications Commission under the present Act[*] may refuse to grant broadcasting licenses on the ground that the ownership of the proposed facilities is in, or in common with, a newspaper, and, if this is answered in the negative, as to whether the insertion of such provision in the Act would be within the power of the Congress, I hand you herewith a brief memorandum.[**]

   I think the answer to the first part of the inquiry is a definite "no." I have more doubt on the question of the power of Congress so to broaden the Act.

   Such a regulation could be enacted only under the Commerce Clause. While congressional power under this clause is plenary, it must be exercised in a manner to attain permitted ends, i.e., regulation of interstate broadcasting and not ownership as such. The case of *R.R. Retirement Bd. v. Alton R.R. Co.*, 295 U.S. 330 (1935), points a limit to congressional powers even under the Commerce Clause. The closest analogy is the Hepburn Commodities Amendment to the Interstate Commerce Act, forbidding transportation of carrier-owned freight. This was reluctantly upheld after the Supreme Court drastically curtailed its obvious meaning. *United States v. Del. & Hudson Co.*, 213 U.S. 366 (1909).

   I do not believe such a provision would violate the clauses protecting the freedom of speech and of the press.

   To uphold the separation of newspapers from radio broadcasting privileges, we would need to support the proposition that separation tended toward equality of opportunity in the dissemination of news; or, to phrase it in terms of monopoly of

---

[*] Editor's Note: The "Act" to which this letter opinion refers is the Communications Act of 1934, Pub. L. No. 73-416, §§ 301–329, 48 Stat. 1064, 1081–92.

[**] Editor's Note: The referenced memorandum begins on page 5 and is dated approximately one month earlier.

interstate communication facilities, we would need to make it clear that to permit the newspapers, the great organs of information now existent, to draw to themselves another great instrumentality of news service might lead to an undesirable control or monopoly of this essential public service. If this conclusion were well-founded and if the drastic measure of absolute separation was reasonably necessary to achieve the end in view, the statute would probably come within the commerce power of Congress.

My opinion is that if this proposal were enacted into law it would probably be held arbitrary and violative of the Fifth Amendment. A reasonable argument for its validity, however, can be made.[*]

HOMER S. CUMMINGS
*Attorney General*

---

[*] Editor's Note: In *FCC v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775 (1978), the Supreme Court ruled that the FCC had authority under the Communications Act to issue a regulation prospectively barring formation or transfer of co-located newspaper-broadcast combinations. The Court also upheld the regulation against challenge under the First Amendment and the Administrative Procedure Act.

December 9, 1936

MEMORANDUM FOR THE SOLICITOR GENERAL

## I. Is It at Present Within the Power of the Federal Communications Commission to Refuse Licenses to Radio Stations Owned by Newspapers?

The authority to regulate radio broadcasting was conferred upon the Federal Communications Commission by the Communications Act of 1934, Pub. L. No. 73-416, §§ 301–329, 48 Stat. 1064, 1081–92 (codified at 47 U.S.C. §§ 301–329). Previously the regulating authority had been vested in the Federal Radio Commission and the Secretary of Commerce by the Radio Act of 1927, Pub. L. No. 69-632, 44 Stat. 1162.

Among the duties of the Communications Commission is that of issuing licenses to radio broadcasting stations. Section 307(a) of the Communications Act provides:

> The Commission, if *public convenience*, *interest*, *or necessity* will be served thereby, subject to the limitations of this chapter, shall grant to any applicant therefor a station license provided for by this chapter.

47 U.S.C. § 307(a) (emphasis supplied).

No section of the Act imposing this duty specifically authorizes the Commission to refuse to issue a license to a particular station simply because it is owned by a newspaper. Quaere, may the Commission deny a request for a license upon the ground that the "public interest, necessity and convenience"[1] will not be served by the participation of the press in the radio business?

The phrase "public interest, necessity, and convenience" does not confer unlimited authority, *Fed. Radio Comm'n v. Nelson Bros. Bond & Mortg.*, 289 U.S. 266, 285 (1933), and there are no reported decisions in which an application has been rejected because the applicant belonged to a particular class of people or was engaged in a particular business. However, licenses have been refused upon the ground that the "public interest" would not be served by their issuance where the applicant was insolvent, *Sproul v. Fed. Radio Comm'n*, 54 F.2d 444 (D.C. Cir. 1931); *Boston Broad. Co. v. Fed. Radio Comm'n*, 67 F.2d 505 (D.C. Cir. 1933),

---

[1] The catch-all phrase "public convenience, interest, or necessity" is not new, similar words being found in the Radio Act of 1927. Section 9 of that Act provided:

> The licensing authority, if public convenience, interest, or necessity will be served thereby, subject to the limitations of this Act, shall grant to any applicant therefor a station license provided for by this Act.

44 Stat. at 1166.

where the area to be served by the applicant station was already adequately supplied with broadcasting facilities, *Goss v. Fed. Radio Comm'n*, 67 F.2d 507 (D.C. Cir. 1933), and where the programs transmitted under a previous license were uninteresting or objectionable, *KFKB Broad. Ass'n. v. Fed. Radio Comm'n*, 47 F.2d 670 (D.C. Cir. 1931); *Trinity Methodist Church, S. v. Fed. Radio Comm'n*, 62 F.2d 850 (D.C. Cir. 1932).[2]

Whether or not the policy of insuring the distribution of unbiased information via the radio will serve the public interest sufficiently to warrant the Commission's refusal to license stations owned by newspapers is a question of fact, which will not be discussed in this memorandum. However, assuming for the purpose of legal discussion that the policy will serve the public interest, the Commission may, consistent with authority, exclude objectionable members of the press from the radio field.

In *KFKB*, a broadcasting unit, owned and operated by a physician, applied to the Commission for a renewal of its license. The evidence showed that the station was operated solely for the benefit of the physician-owner and that a considerable portion of the broadcasting period was devoted to "quack" medical programs, in which certain prescriptions, known only by numbers and sold exclusively by drug stores owned by the physician, were recommended to persons who had written letters describing their symptoms and asking for medical advice. The Commission in refusing the request expressed the opinion that such programs were detrimental to the public health and did not serve the public interest. 47 F.2d at 671. Upon appeal, the ruling of the Commission was sustained. The court said:

> When Congress provided that the question whether a license should be issued or renewed should be dependent upon a finding of public interest, convenience, or necessity, it very evidently had in mind that broadcasting should not be a mere adjunct of a particular business but should be of a public character. Obviously, there is no room in the broadcast band for every business or school of thought.

*Id.* at 672.

It was contended by the applicant station that the refusal to issue the license because of the nature of past programs amounted to censorship in violation of section 326 of the Communications Act. *Id.* That section reads as follows:

> Nothing in this chapter shall be understood or construed to give the Commission the power of censorship over the radio communications or signals transmitted by any radio station, and no regulation or con-

---

[2] It should be noted that all of these exemplary cases were litigated under the Radio Act of 1927. However, it is submitted that they are on point because the licensing provision of the Act is identical with that of the Communications Act.

dition shall be promulgated or fixed by the Commission which shall interfere with the right of free speech by means of radio communication. No person within the jurisdiction of the United States shall utter any obscene, indecent, or profane language by means of radio communication.

47 U.S.C. § 326.

In overruling the contention the court said:

> Appellant contends that the attitude of the commission amounts to a censorship of the station contrary to the provisions of section 29 of the Radio Act of 1927 (47 U.S.C.A. § 109). This contention is without merit. There has been no attempt on the part of the commission to subject any part of appellant's broadcasting matter to scrutiny prior to its release. In considering the question whether the public interest, convenience, or necessity will be served by a renewal of appellant's license, the commission has merely exercised its undoubted right to take note of appellant's past conduct, which is not censorship.

47 F.2d at 672. Further, in *Nelson Bros.*, the Court indicated that the "public interest, necessity, and convenience" requirement entailed a supervision of the "scope, character, and quality of services" rendered by the radio. 289 U.S. at 285.

In *Trinity Methodist*, station KGEF of Los Angeles, California, applied for a renewal of its license. The request was denied because the evidence showed that the station was owned and dominated by a Methodist minister who had twice been convicted of contempt of court because of statements broadcast through this station, that its facilities had been used for bitter attacks on the Catholic Church and the Jewish race, and that the programs were generally sensational rather than instructive. The ruling was sustained by the court of appeals on the ground that the public interest was served by the denial of the license. 62 F.2d at 852.

It was argued that the Commission's refusal to renew the license because of the nature of the programs transmitted under the prior permit interfered with the constitutional right of free speech guaranteed by the First Amendment. *Id.* at 851. However, the contention was overruled, and the court said:

> If it be considered that one in possession of a permit to broadcast in interstate commerce may, without let or hindrance from any source, use these facilities, reaching out, as they do, from one corner of the country to the other, to obstruct the administration of justice, offend the religious susceptibilities of thousands, inspire political distrust and civic discord, or offend youth and innocence by the free use of words suggestive of sexual immorality, and be answerable for slander only at the instance of the one offended, then this great sci-

ence, instead of a boon, will become a scourge, and the nation a theater for the display of individual passions and the collision of personal interests. This is neither censorship nor previous restraint, nor is it a whittling away of the rights guaranteed by the First Amendment, or an impairment of their free exercise. Appellant may continue to indulge his strictures upon the characters of men in public office. He may just as freely as ever criticize religious practices of which he does not approve. He may even indulge private malice or personal slander—subject, of course, to be required to answer for the abuse thereof—but he may not, as we think, demand, of right, the continued use of an instrumentality of commerce for such purposes, or any other, except in subordination to all reasonable rules and regulations Congress, acting through the Commission, may prescribe.

62 F.2d at 852–53.

If the Commission should refuse to issue an original license to a station simply because it was owned by a newspaper, an objection that the order deprived the applicant of his property without due process of law could be successfully interposed. Even granting the public propriety of the policy of distributing unbiased information, it can hardly be assumed that every newspaper applicant will operate its station in a manner calculated to offend the policy, when it is a matter of common knowledge that many papers are scrupulously careful to publish accurate and uncolored accounts of the news of the day. The participation of such papers in the radio broadcasting business would promote the Commission's policy, and their exclusion without a trial would be arbitrary and unreasonable.

This arbitrary interference with desirable members of the press can be avoided by a plan of probation. The period during which the license to broadcast shall be effective is within the Commission's discretion, provided it does not exceed three years. 47 U.S.C. § 307(d). By restricting the original license to a period of relatively short duration, the Commission could put each applicant on trial, and, if its broadcasting tactics offend the policy, a renewal permit may be denied. Such a plan would not only meet the due process test of reasonableness but it would also be expedient and consistent with authority. *Trinity Methodist*, 62 F.2d 850; *KFKB*, 47 F.2d 670.

In conclusion, the ultimate answer to the question of the Commission's power to refuse to license newspaper-owned stations is dependent upon whether or not the policy of insuring the distribution of unbiased information will serve the public interest. Assuming an affirmative answer to this question of fact, it is apparent that the Commission may refuse to renew the licenses of stations who have abused the policy under a prior permit, but there are constitutional objections to a refusal where the applicant has had no trial.

## II. Would the Statute Authorizing the Federal Communications Commission to Refuse to License Radio Stations Owned by Newspapers Be Constitutional?

Radio communication constitutes interstate commerce and is subject to regulation by the federal government. In *Fisher's Blend Station, Inc. v. Tax Comm'n of Wash.*, 297 U.S. 650 (1936), the United States Supreme Court said:

> By its very nature broadcasting transcends state lines and is national in its scope and importance—characteristics which bring it within the purpose and protection, and subject it to the control, of the commerce clause.

*Id.* at 655.

The power of Congress to regulate interstate commerce has been held to include the power to prohibit, in certain cases, the interstate movement of persons or things. For example, Congress lawfully forbade the interstate transportation of lottery tickets, *Champion v. Ames*, 188 U.S. 321 (1903), of diseased livestock, *Missouri, Kan. & Tex. Ry. v. Haber*, 169 U.S. 613 (1898), of adulterated or misbranded foods, *Hipolite Egg Co. v. United States*, 220 U.S. 45 (1911), of white slaves, *Hoke v. United States*, 227 U.S. 308 (1913), of prize fight films, *Weber v. Freed*, 239 U.S. 325 (1915), of intoxicants outlawed by the state of destination, *Clark Distilling Co. v. W. Md. Ry.*, 242 U.S. 311 (1917), and of stolen automobiles, *Brooks v. United States*, 267 U.S. 432 (1925).

In all these exemplary cases the power sustained was addressed directly to the interstate transportation of an inherently dangerous person or thing. The prohibitions did not extend to the ownership of the subject of commerce or the means of transportation. The proposed statute, however, would go beyond a regulation of the actual movement of commerce and deny a newspaper the privilege of owning an instrument of interstate communication.

The power of Congress to regulate interstate commerce extends only to that commerce which is defined as "intercourse for the purpose of trade" and includes the transportation, purchase, sale, and exchange of goods between citizens of different states. *Carter v. Carter Coal Co.*, 298 U.S. 238, 298 (1936). There is no authority to sustain an extension of the power to include the ownership of the means of interstate communication, and a recent decision, *id.* at 298–303, construing the scope of the Commerce Clause, is concrete evidence of the narrow confines to which the regulatory power is restricted.

Assuming, however, that the proposed statute would be within the commerce power, there remains the question of the propriety of the regulation. It is axiomatic that the federal government, in the exercise of any delegated power, such as the power to regulate interstate commerce, is subject to the constitutional limitation of due process. *Del., Lackawanna & W.R.R. v. United States*, 231 U.S. 363 (1913);

*Hamilton v. Ky. Distilleries & Warehouse Co.*, 251 U.S. 146 (1919). The requirements of due process are satisfied if the regulation is not unreasonable, arbitrary, or capricious and if it has a real and substantial relation to the object sought to be attained. *Nebbia v. New York*, 291 U.S. 502 (1934).

The result of any application of the due process test is largely dependent upon the facts adduced in each particular case. In his opinion in *Nebbia*, Mr. Justice Roberts indicates that the United States Supreme Court is aware of this factor, for he wrote:

> It results that a regulation valid for one sort of business, or in given circumstances, may be invalid for another sort, or for the same business under other circumstances, because the reasonableness of each regulation depends upon the relevant facts.

*Id.* at 525.

Thus, any decision upon the validity of the proposed statute will depend largely upon what data the Commission could produce to prove that it is in the public interest to exclude newspapers from the radio broadcasting field. The due process requirements could probably be satisfied if there are facts to show that newspapers in the past have abused the broadcasting privilege by using the facilities of their stations to transmit objectionable programs, or that the ownership of broadcasting stations by the press is inherently dangerous to the public health, safety, or morals.

It should be noted also that a newspaper does not have an absolute right to engage in radio broadcasting. The privilege of engaging in a particular business or occupation is a property right, of which a citizen may not be deprived without due process of law, *Louis K. Liggett Co. v. Baldridge*, 278 U.S. 105 (1928), but there is no constitutional guarantee that the privilege will be unrestricted, *Nebbia*, 291 U.S. 502. In the interest of the public welfare, certain types of business have been prohibited altogether, *Powell v. Pennsylvania*, 127 U.S. 678 (1888), while participation in others has been conditioned, *Dent v. West Virginia*, 129 U.S. 114 (1889). Due process only requires that the regulation be reasonable. *Smith v. Texas*, 233 U.S. 630 (1914).

The possibility that the proposed statute will violate the First Amendment is entitled to but little consideration. Since the scope of the Act does not extend beyond the exclusion of a certain class of people from the broadcasting business, there would be no interference with the right of free speech. If the Act entailed a censorship of the material transmitted or denied a newspaper the right to express its editorial policies by way of the radio, the interference would be apparent, but as proposed it contains no provisions of this nature. At most, ownership, not usage, is regulated.

Further, broadcasting is not an incident of the newspaper business, and the prohibitory provisions of the statute would not affect a newspaper until it had left its usual sphere of activity. Even then, the newspaper would be subject to regula-

tion only in its capacity as a radio station owner, and any interference would be with the freedom of the radio broadcasting, not with the freedom of the press.

In conclusion, it is submitted that the proposed statute is probably unconstitutional because it attempts to regulate matters beyond the scope of interstate commerce. Even though the Commerce Clause should be said to embrace the power to enact the proposed statutes, the regulation might not meet the requirements of due process, and it undoubtedly would be subjected to wide publicity and bitter criticism. Therefore, it is suggested that the most expedient means of handling the problem is to adopt the plan of probation heretofore discussed, which may be put into operation under the present Act.

NEWMAN A. TOWNSEND, JR.[*]
*Special Attorney*
*Office of the Assistant Solicitor General*

---

[*] Editor's Note: The author was a judge who served on the staff of the Office of the Assistant Solicitor General for many years, including as Acting Assistant Solicitor General from 1941–42. *See* Robert H. Jackson, *That Man: An Insider's Portrait of Franklin D. Roosevelt* 95 (John Q. Barrett ed., 2003) (describing Townsend as "a hard-headed, conservative, and forthright former judge").